AMERICAN PAPER INSTITUTE, INC. *v.* AMERICAN
ELECTRIC POWER SERVICE CORP. ET AL.

No. 82–34.   Argued March 22, 1983—Decided May 16, 1983*

---

*Together with No. 82–226, *Federal Energy Regulatory Commission* v.
*American Electric Power Service Corp. et al.,* also on certiorari to the
same court.

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the consideration or decision of the cases.

*Deputy Solicitor General Bator* argued the cause for petitioners in both cases. With him on the briefs for petitioner in No. 82–226 were *Solicitor General Lee, Deputy Solicitor General Claiborne, Elliott Schulder, Charles A. Moore, Jerome M. Feit,* and *Robert F. Shapiro. Zachary Shimer, Paul G. Pennoyer, Jr., Rigdon H. Boykin, Richard L. Schmalz,* and *Walter Kiechel, Jr.,* filed briefs for petitioner in No. 82–34.

*Edward Berlin* argued the cause for respondents in both cases. With him on the brief for respondent Electric Utili-

ties was *Thomas M. Lemberg, Andrew D. Weissman, Robert S. Taylor, A. Joseph Dowd,* and *Peter Garam. John T. Miller, Jr.,* filed a brief for respondent Elizabethtown Gas Co.†

JUSTICE MARSHALL delivered the opinion of the Court.

This case concerns two rules promulgated by the Federal Energy Regulatory Commission (FERC) pursuant to § 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), 92 Stat. 3144, as amended, 16 U. S. C. § 824a–3 (1976 ed., Supp. V). The first rule requires electric utilities to purchase electric energy from cogenerators and small power producers at a rate equal to the purchasing utility's full avoided cost, *i. e.,* the cost the utility would have incurred had it generated the electricity itself or purchased the electricity from another source. The second rule requires utilities to make such interconnections with cogenerators and small power producers as are necessary to effect purchases or sales of electricity authorized by PURPA. The Court of Appeals held that FERC had not adequately explained its adoption of the full-avoided-cost rule, and that it exceeded its statutory authority in promulgating the interconnection rule. 219 U. S. App. D. C. 1, 675 F. 2d 1226 (1982). We reverse.

I

A

Section 210 of PURPA was designed to encourage the development of cogeneration and small power production fa-

---

†Briefs of *amici curiae* urging reversal were filed by *Samuel Efron, David J. Bardin, James P. Mercurio,* and *Lewis E. Leibowitz* for Diamond Shamrock Corp. et al.; by *Robert H. Loeffler, Steven S. Rosenthal,* and *Henry D. Levine* for Kerr-McGee Chemical Corp. et al.; and by *Gregory A. Thomas, Alan S. Miller,* and *William A. Butler* for the Natural Resources Defense Council, Inc.

*Robert L. Baum, Carl D. Hobelman,* and *Eugene R. Fidell* filed a brief for the Edison Electric Institute as *amicus curiae* urging affirmance.

cilities.[1]  As we noted in *FERC* v. *Mississippi*, 456 U. S. 742, 750 (1982) (footnote omitted), "Congress believed that increased use of these sources of energy would reduce the demand for traditional fossil fuels," and it recognized that electric utilities had traditionally been "reluctant to purchase power from, and to sell power to, the nontraditional facilities."  Accordingly, Congress directed FERC to prescribe, within one year of the statute's enactment, rules requiring electric utilities to deal with qualifying cogeneration and small power production facilities.  PURPA § 210(a), 16 U. S. C. § 824a–3(a) (1976 ed., Supp. V).  With respect to the purchase of electricity from cogeneration and small power production facilities, Congress provided that the rate to be set by the Commission

"(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and

"(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

"No such rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy."  PURPA § 210(b), 16 U. S. C. § 824a–3(b) (1976 ed., Supp. V).

Following rulemaking proceedings, FERC promulgated regulations governing transactions between utilities and those cogeneration and small power production facilities, designated as "qualifying facilities," 18 CFR §§ 292.201–292.207

---

[1] The statute defines a "cogeneration facility" as a facility that produces both electric energy and steam or some other form of useful energy, such as heat.  16 U. S. C. § 796(18)(A) (1976 ed., Supp. V).  A "small power production" facility is a facility that has a production capacity of not more than 80 megawatts and produces electric power from biomass, waste, or renewable resources such as wind, water, or solar energy.  16 U. S. C. § 796(17)(A) (1976 ed., Supp. V).

(1982), that may invoke the provisions of PURPA to sell electricity to and purchase electricity from utilities.

The first regulation at issue in this case, 18 CFR § 292.-304(b)(2) (1982), requires a utility to purchase electricity from a qualifying facility at a rate equal to the utility's full avoided cost. The utility's full avoided cost is "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." PURPA § 210(d), 16 U. S. C. § 824a–3(d) (1976 ed., Supp. V). See 18 CFR § 292.101(b)(6) (1982) (the term full "avoided costs" used in the regulations is the equivalent of the term "incremental cost of alternative electric energy" used in § 210(d) of PURPA). In its order accompanying the promulgation of this rule, FERC explained its decision to set the rate at full avoided cost rather than at a level that would result in direct rate savings for utility customers by permitting a utility to obtain energy at a cost less than the cost to the utility of producing the energy itself or purchasing it from an alternative source. 45 Fed. Reg. 12214 (1980). The Commission emphasized the need to provide incentives for the development of cogeneration and small power production:

> "[I]n most instances, if part of the savings from cogeneration and small power production were allocated among the utilities' ratepayers, any rate reductions will be insignificant for any individual customer. On the other hand, if these savings are allocated to the relatively small class of qualifying cogenerators and small power producers, they may provide a significant incentive for a higher growth rate of these technologies." *Id.*, at 12222.

The Commission noted that "ratepayers and the nation as a whole will benefit from the decreased reliance on scarce fossil fuels, such as oil and gas, and the more efficient use of energy." *Ibid.*

FERC rejected proposals that it set the rate for the purchase of electricity from qualifying facilities at a fixed percentage of the purchasing utility's full avoided cost:

> "[I]n most situations, a qualifying cogenerator or small power producer will only produce energy if its marginal cost of production is less than the price he receives for its output. If some fixed percentage is used, a qualifying facility may cease to produce additional units of energy when its costs exceed the price to be paid by the utility. If this occurs, the utility will be forced to operate generating units which either are less efficient than those which would have been used by the qualifying facility, or which consume fossil fuel rather than the alternative fuel which would have been consumed by the qualifying facility had the price been set at full avoided costs." *Id.*, at 12222–12223.

The second regulation at issue here, 18 CFR § 292.303 (1982), provides that electric utilities shall purchase electricity made available by qualifying facilities, sell electricity to qualifying facilities upon request, and, most important for present purposes, "make such interconnections with any qualifying facility as may be necessary to accomplish purchases or sales under this subpart." § 292.303(c)(1). An interconnection is a physical connection that allows electricity to flow from one entity to another.[2]

In its order the Commission rejected the contention that § 210(e)(3) of PURPA requires it to afford an opportunity for an evidentiary hearing to any utility that is unwilling to make an interconnection with a qualifying facility that has invoked the provisions of PURPA to enter into a purchase or sale with the utility. Section 210(e)(3), 92 Stat. 3145, provides in relevant part:

---

[2] In an accompanying regulation, FERC directed that each qualifying facility "pay any interconnection costs which the State regulatory authority . . . or nonregulated electric utility may assess against the qualifying facility on a nondiscriminatory basis." 18 CFR § 292.306(a) (1982).

"No qualifying small power production facility or qualifying cogeneration facility may be exempted under this subsection from—

. . . . .

"(B) the provisions of section 210 . . . or 212 of the Federal Power Act . . . or the necessary authorities for enforcement of any such provision under the Federal Power Act . . . ." 16 U. S. C. § 824a–3(e)(3) (1976 ed., Supp. V).

Sections 210 and 212 of the Federal Power Act (FPA), 16 U. S. C. §§ 824i and 824k (1976 ed., Supp. V), describe the procedure to be followed by FERC when an electric utility, federal power marketing agency, cogenerator, or small power producer applies for an order requiring another such facility to make an interconnection. Section 210 provides that, upon receipt of an application for an order requiring an interconnection, the Commission shall issue notice to each affected state regulatory authority, utility, federal power marketing agency, and owner or operator of a cogeneration facility or small power production facility, and to the public, § 210(b)(1), 16 U. S. C. § 824i(b)(1) (1976 ed., Supp. V), afford an opportunity for an evidentiary hearing, § 210(b)(2), 16 U. S. C. § 824i(b)(2) (1976 ed., Supp. V), and issue an order approving the application only if it determines that approval

"(1) is in the public interest,
"(2) would—
    "(A) encourage overall conservation of energy or capital,
    "(B) optimize the efficiency of use of facilities and resources, or
    "(C) improve the reliability of any electric utility system or Federal power marketing agency to which the order applies, and
"(3) meets the requirements of [§ 212 of the FPA]." 16 U. S. C. § 824i(c) (1976 ed., Supp. V).

Section 212 of the FPA, 16 U. S. C. § 824k (1976 ed., Supp. V), provides that an order approving an interconnection under § 210 may be issued only if the Commission determines that the interconnection is not likely to result in a reasonably ascertainable uncompensated loss for any electric utility, cogenerator, or small power producer, impose an undue burden on any such facility, unreasonably impair the reliability of any electric utility, or impair the ability of any electric utility to supply adequate service to its customers.[3]

---

[3] Section 212 of the FPA, as set forth in 16 U. S. C. § 824k (1976 ed., Supp. V), provides in pertinent part:

(a) "No order may be issued by the Commission under section 824i [FPA § 210] . . . of this title unless the Commission determines that such order—

"(1) is not likely to result in a reasonably ascertainable uncompensated economic loss for any electric utility, qualifying cogenerator, or qualifying small power producer, as the case may be, affected by the order;

"(2) will not place an undue burden on an electric utility, qualifying cogenerator, or qualifying small power producer, as the case may be, affected by the order;

"(3) will not unreasonably impair the reliability of any electric utility affected by the order; and

"(4) will not impair the ability of any electric utility affected by the order to render adequate service to its customers.

"The determination under paragraph (1) shall be based upon a showing of the parties.    The Commission shall have no authority under section 824i . . . of this title to compel the enlargement of generating facilities."

(b) "No order may be issued under section 824i . . . of this title unless the applicant for such order demonstrates that he is ready, willing, and able to reimburse the party subject to such order for—

"(1) in the case of an order under section 824i of this title, such party's share of the reasonably anticipated costs incurred under such order . . ."

.            .            .            .            .

(d) "If the Commission does not issue any order applied for under section 824i . . . of this title, the Commission shall, by order, deny such application and state the reasons for such denial."

(e) "No provision of section 824i . . . of this title shall be treated—

"(1) as requiring any person to utilize the authority of such section 824i . . . of this title in lieu of any other authority of law, or

"(2) as limiting, impairing, or otherwise affecting any authority of the Commission under any other provision of law."

In concluding that an evidentiary hearing under the FPA is not required prior to an interconnection necessary to complete a purchase or sale authorized by PURPA, the Commission reasoned that § 210(a) of PURPA "provides a general mandate for the Commission to prescribe rules necessary to encourage cogeneration and small power production." 45 Fed. Reg. 12221 (1980). The Commission also emphasized that "a basic purpose of section 210 of PURPA is to provide a market for the electricity generated by small power producers and cogenerators," and that "to require qualifying facilities to go through the complex procedures set forth in section 210 of the Federal Power Act to gain interconnection would, in most circumstances, significantly frustrate" the achievement of that purpose. *Ibid.*

Following the filing of several petitions for rehearing, the Commission issued an order adhering to both the full-avoided-cost rule and the interconnection rule. *Id.,* at 33958.

## B

Respondents American Electric Power Service Corp., Consolidated Edison Co. of New York, Inc., and Colorado-Ute Electric Association, Inc., sought review of the Commission's rules in the United States Court of Appeals for the District of Columbia Circuit. The Court of Appeals vacated both rules. 219 U. S. App. D. C. 1, 675 F. 2d 1226 (1982).

The Court of Appeals concluded that FERC had not adequately demonstrated that the full-avoided-cost rule was consistent with the mandate of § 210(b) of PURPA that the Commission prescribe rates for purchases of electric energy from qualifying facilities that are " 'just and reasonable to the electric consumers of the electric utility' " and " 'in the public interest.' " *Id.,* at 7, 675 F. 2d, at 1232. "By ordering that the purchase rate be equal to the full avoided cost in every case, FERC has, without convincing explanation, simply adopted as a uniform rule the maximum purchase rate

specified in the statute." *Id.*, at 8, 675 F. 2d, at 1233.[4]  The court stressed that "FERC should allocate the benefits more evenly between the cogenerators and the utilities if the utilities can demonstrate that, under a percentage of avoided cost approach, an allocation less heavily favoring the cogenerators is in the public interest and the interest of the utilities' electric consumers, and will not disproportionately discourage cogeneration." *Id.*, at 9, 675 F. 2d, at 1234.  While acknowledging that an approach requiring calculation of each cogenerator's costs on a case-by-case basis "would indeed veer toward the public utilities-style rate setting that Congress wanted to avoid," the Court of Appeals emphasized that FERC should have given additional consideration to a percentage-of-avoided-cost approach, whereby FERC would either set a percentage itself or establish a range within which each state regulatory commission could fix a precise percentage. *Ibid.*[5]

The Court of Appeals held that FERC had exceeded its authority in promulgating the interconnection rule.  The court reasoned that the "relatively *specific limitation* on authority in PURPA section 210(e)(3) . . . must control over the relatively *general grant* of authority in FPA section 212(e)." *Id.*, at 15, 675 F. 2d, at 1240 (emphasis in original).  The court concluded that the Commission must provide notice to interested parties and afford an opportunity for an eviden-

---

[4] With respect to the Commission's statement that any savings to consumers that a lower rate might produce would be insignificant in comparison to the benefit to qualifying facilities provided by the full-avoided-cost rate, the court suggested that the Commission had failed to "bear in mind, as Congress surely knew, that inevitably the impact of FERC's rules per consumer will be less than their impact per cogenerator." 219 U. S. App. D. C., at 9, 675 F. 2d, at 1234.

[5] The court proceeded to "outline some additional concerns raised by the full avoided cost rule, which the Commission should address in its subsequent rulemaking." *Ibid.* See *id.*, at 9–11, 675 F. 2d, at 1234–1236.

tiary hearing with respect to each interconnection requested by a qualifying facility.

Following the denial of petitions for rehearing and rehearing en banc,[6] petitions for certiorari were filed by both FERC and American Paper Institute, Inc., the national trade association of the pulp, paper, and paperboard industry, which accounts for a large share of the cogeneration of electric power in the United States today. We granted both petitions. 459 U. S. 904 (1982).

## II

The first question before us is whether FERC's action in promulgating the full-avoided-cost rule was "arbitrary, capricious, [or] an abuse of discretion." 5 U. S. C. § 706(2)(A).[7]

---

[6] In denying a petition for rehearing, the Court of Appeals emphasized that it had not declared the full-avoided-cost rule inconsistent with PURPA but had "simply remanded the matter because the Commission had failed to explain 'its rationale and process of consideration.'" 219 U. S. App. D. C., at 21, 675 F. 2d, at 1246, quoting id., at 8, 675 F. 2d, at 1233. A suggestion for rehearing en banc was denied by a vote of 3 to 2, with 6 of the 11 active Circuit Judges not participating. Id., at 21, 675 F. 2d, at 1246.

[7] It is not entirely clear from the Court of Appeals' opinion what standard of review the court applied, but it appears that the court may have erroneously employed the substantial-evidence standard. The court criticized FERC for failing "to demonstrate the factual basis," id., at 9, 675 F. 2d, at 1234, for its finding that sharing the savings from cogeneration with consumers would afford consumers only insubstantial savings, and it cited in a footnote an earlier decision that had employed the substantial-evidence test in a case involving informal rulemaking by the Commission under the FPA. Id., at 9, n. 36, 675 F. 2d, at 1234, n. 36, citing Public Systems v. FERC, 196 U. S. App. D. C. 66, 606 F. 2d 973 (1979).

In any event, the Court of Appeals should have applied only the arbitrary-and-capricious standard. Unlike the FPA, see 16 U. S. C. § 825l(b), PURPA does not direct reviewing courts to determine whether orders entered thereunder are supported by substantial evidence. In the absence of a specific command in PURPA to employ a particular standard of review, the full-avoided-cost rule must be reviewed solely under the more lenient arbitrary-and-capricious standard prescribed by the Administrative Procedure Act for judicial review of informal rulemaking. See, e. g., FCC

We cannot answer this question simply by noting that the full-avoided-cost rule is within the range of permissible rates that Congress established in § 210(b) of PURPA. The Commission plainly has the authority to adopt a full-avoided-cost rule, for PURPA sets full avoided cost as the maximum rate that the Commission may prescribe. Whether the Commission properly exercised that authority is a separate issue. To decide whether the Commission's action was "arbitrary, capricious, [or] an abuse of discretion," we must determine whether the agency adequately considered the factors relevant to choosing a rate that will best serve the purposes of the statute, and whether the agency committed "a clear error of judgment." *Citizens to Preserve Overton Park* v. *Volpe*, 401 U. S. 402, 416 (1971).

FERC's explanation of its reasons for promulgating the full-avoided-cost rule must be examined in light of the criteria set forth in § 210(b) of PURPA, 16 U. S. C. § 824a–3(b) (1976 ed., Supp. V), which provides that the purchase rate established by the Commission must be "just and reasonable to the electric consumers of the electric utility and in the public interest" and must not discriminate against qualifying facilities.[8] Since the full-avoided-cost rule plainly satisfies the nondiscrimination requirement, we need only consider whether FERC adequately explained why the rule is "just and reasonable to the electric consumers of the electric utility and in the public interest."

We cannot accept respondents' suggestion, Brief for Respondent Electric Utilities 9, and n. 4, that the "just and reasonable" language in § 210(b) was intended to require that the purchase rate be set " 'at the lowest possible reasonable rate

---

v. *National Citizens Committee for Broadcasting*, 436 U. S. 775, 803 (1978).

[8] See also H. R. Conf. Rep. No. 95–1750, p. 98 (1978) (the purchase rate prescribed by the Commission is to be "the lower of . . . a rate which is just and reasonable to consumers of the utility, in the public interest, and nondiscriminatory, or the incremental cost of alternate electric energy").

consistent with the maintenance of adequate service in the public interest.'" *Atlantic Refining Co.* v. *Public Service Comm'n of New York,* 360 U. S. 378, 388 (1959), quoting the original version of the Natural Gas Act. Simply on the basis of the statutory language, we would be reluctant to infer that Congress intended the terms "'just and reasonable,'" which are frequently associated with cost-of-service utility rate-making, see, *e. g.*, *NAACP* v. *FPC*, 425 U. S. 662, 666 (1976), to adopt a cost-of-service approach in the very different context of cogeneration and small power production by nontraditional facilities. The legislative history confirms, moreover, that Congress did not intend to impose traditional ratemaking concepts on sales by qualifying facilities to utilities. The Conference Report states in pertinent part:

"It is not the intention of the conferees that cogenerators and small power producers become subject . . . to the type of examination that is traditionally given to electric utility rate applications to determine what is the just and reasonable rate that they should receive for their electric power. The conferees recognize that cogenerators and small power producers are different from electric utilities, not being guaranteed a rate of return on their activities generally or on the activities vis a vis the sale of power to the utility and whose risk in proceeding forward in the cogeneration or small power production enterprise is not guaranteed to be recoverable.

"[C]ogeneration is to be encouraged under this section and therefore the examination of the level of rates which should apply to the purchase by the utility of the cogenerator's or small power producer's power should not be burdened by the same examination as are utility rate applications, but rather in a less burdensome manner. The establishment of utility type regulation over them would act as a significant disincentive to firms interested in cogeneration and small power production." H. R. Conf. Rep. No. 95–1750, pp. 97–98 (1978).

In contrast, a subsequent passage in the Conference Report explicitly states that the "just and reasonable" language of § 210(c), 16 U. S. C. § 824a–3(c) (1976 ed., Supp. V), which concerns sales *by* utilities *to* qualifying facilities, "*is* intended to refer to traditional utility ratemaking concepts." H. R. Conf. Rep. No. 95–1750, *supra*, at 98 (emphasis added).

The Commission did not ignore the interest of electric utility consumers "in receiving electric energy at equitable rates." H. R. Conf. Rep. No. 95–1750, *supra*, at 97.[9] The Commission recognized that the full-avoided-cost rule would not directly provide any rate savings to electric utility consumers, but deemed it more important that the rule could "provide a significant incentive for a higher growth rate" of cogeneration and small power production, and that "these ratepayers and the nation as a whole will benefit from the decreased reliance on scarce fossil fuels, such as oil and gas, and the more efficient use of energy."[10] 45 Fed. Reg. 12222 (1980). As the Commission explained, a purchase rate es-

[9] We interpret the "just and reasonable" language of § 210(b) to require consideration of potential rate savings for electric utility consumers. Of course, even when utilities purchase electric energy from qualifying facilities at full avoided cost rather than at some lower rate, the rates the utilities charge their customers will not be increased, for by hypothesis the utilities would have incurred the same costs had they generated the energy themselves or purchased it from other sources. Moreover, a utility's existing rates will ordinarily have been determined to be "just and reasonable" by the appropriate state regulatory authority. But it does not follow that the full-avoided-cost rule is necessarily "just and reasonable to the electric consumers of the electric utilities" within the meaning of § 210(b) of PURPA. Unless the "just and reasonable" language is to be regarded as mere surplusage, it must be interpreted to mandate consideration of rate savings for consumers that could be produced by setting the rate at a level lower than the statutory ceiling.

[10] A decrease in the utilities' reliance on fossil fuels may result in a reduction of the prices of those fuels to levels lower than would have been the case with higher demand. Since the rates the utilities are permitted to charge their customers are based on their costs, electric utility customers can expect to share in the savings to the utilities resulting from reduced fuel prices.

tablished at a fixed percentage of avoided cost would discourage production of electric energy by qualifying facilities whose marginal costs exceeded the rate that a purchasing utility would be required to pay under this approach, whereas those same facilities would retain an incentive to produce energy under the full-avoided-cost rule so long as their marginal costs did not exceed the full avoided cost of the purchasing utility. *Id.*, at 12222–12223.

The Commission would have encountered considerable difficulty had it attempted to determine an appropriate rate less than full avoided cost. A wide variety of technologies are used in cogeneration and small power production, including internal combustion engines, steam turbines, combustion turbines, windmills, solar cells, and hydro turbines. Facilities may vary greatly in capacity. It would have been extremely difficult, if not impossible, for the Commission to make any useful estimate of the amount of cogeneration and small power production that would be discouraged by setting the rate at a level lower than full avoided cost.

It bears emphasizing that the full-avoided-cost rule is not as inflexible as might appear at first glance. First, any state regulatory authority and any nonregulated utility may apply to the Commission for a waiver of the rule. A waiver may be granted if the applicant demonstrates that a full-avoided-cost rate is unnecessary to encourage cogeneration and small power production. 18 CFR § 292.403 (1982). Second, a qualifying facility and a utility may negotiate a contract setting a price that is lower than a full-avoided-cost rate. § 292.301(b)(1). Because the full-avoided-cost rule is subject to revision by the Commission as it obtains experience with the effects of the rule, it may often be in the interest of a qualifying facility to negotiate a long-term contract at a lower rate. The Commission's rule simply establishes the rate that applies in the absence of a waiver or a specific contractual agreement.

Under these circumstances it was not unreasonable for the Commission to prescribe the maximum rate authorized by PURPA.[11] The Commission's order makes clear that the Commission considered the relevant factors and deemed it most important at this time to provide the maximum incentive for the development of cogeneration and small power production, in light of the Commission's judgment that the entire country will ultimately benefit from the increased development of these technologies and the resulting decrease in the Nation's dependence on fossil fuels. The Commission has a statutory mandate to set a rate that is "in the public interest," and as this Court stated in *NAACP* v. *FPC*, 425 U. S., at 669, "the words 'public interest' in a regulatory statute . . . take meaning from the purposes of the regulatory legislation." The basic purpose of § 210 of PURPA was to increase the utilization of cogeneration and small power production facilities and to reduce reliance on fossil fuels. See *FERC* v. *Mississippi*, 456 U. S., at 750. At this early stage

---

[11] We reach this conclusion even though we agree with the Court of Appeals, see n. 4, *supra*, that the rule was not adequately explained by the Commission's observation that "in most instances, if part of the savings from cogeneration and small power production were allocated among the utilities' ratepayers, any rate reductions will be insignificant for any individual customer," whereas the rule would provide significant incentives for cogenerators and small power producers. 45 Fed. Reg. 12222 (1980). In the context of ratemaking, it is typically the case that any increment in the rate will "make a small dent in the consumer's pocket," *FPC* v. *Texaco Inc.*, 417 U. S. 380, 399 (1974), while that same increment will have substantial consequences for the parties to whom the rate is paid. FERC's statutory mandate to prescribe a rate that "shall be just and reasonable to the electric consumers of the electric utility," 16 U. S. C. § 824a–3(b)(1) (1976 ed., Supp. V), obviously reflects a congressional determination that potential savings for consumers as a class are important even though rate changes will generally not have great economic significance for any individual consumer. Cf. *FPC* v. *Texaco Inc.*, *supra*, at 399 ("Even if the effect of increased small-producer prices would make a small dent in the consumer's pocket, . . . the [Natural Gas] Act makes unlawful all rates which are not just and reasonable, and does not say a little unlawfulness is permitted").

in the implementation of PURPA, it was reasonable for the Commission to prescribe the maximum rate authorized by Congress and thereby provide the maximum incentive for the development of cogeneration and small power production.

## III

Absent § 210(e)(3) of PURPA, there would be no doubt as to the validity of the Commission's interconnection rule. Section 210(a) of PURPA, 16 U. S. C. § 824a-3(a) (1976 ed., Supp. V), provides the Commission with general authority to promulgate

"such rules as it determines necessary to encourage co-generation and small power production . . . which rules require electric utilities to offer to—

"(1) sell electric energy to qualifying cogeneration facilities and qualifying small power production facilities and

"(2) purchase electric energy from such facilities."

The authority to promulgate such rules as are necessary to require purchases and sales plainly encompasses the power to promulgate rules requiring utilities to make physical connections with qualifying facilities in order to consummate purchases and sales authorized by PURPA. No purchase or sale can be completed without an interconnection between the buyer and seller.

In the absence of a specific provision to the contrary, the Commission's power to promulgate rules under PURPA requiring interconnections would not be negated by the provisions of the FPA that give the Commission the authority to conduct adjudicatory proceedings and issue orders requiring interconnections. As a general matter, the existence of power to proceed by adjudication under one statute is in no way inconsistent with the existence of power to proceed by rulemaking under another statute. Moreover, there is nothing in the FPA to suggest that the Commission must proceed by adjudication in determining the obligations of facilities

within its jurisdiction to make interconnections. On the contrary, Congress expressly provided in § 212(e) of the FPA, 16 U. S. C. § 824k(e) (1976 ed., Supp. V), that § 210 of the FPA shall not be construed "as requiring any person to utilize the authority of [§ 210] . . . in lieu of any other authority of law," or "as limiting, impairing, or otherwise affecting any authority of the Commission under any other provision of law."

The critical question, therefore, is whether § 210(e)(3) of PURPA deprives FERC of the power it would otherwise have under § 210(a) of PURPA to promulgate rules requiring utilities to make such interconnections with qualifying facilities as are necessary to effect purchases or sales authorized by the Act. In holding the interconnection rule invalid, the Court of Appeals relied upon what it took to be "the literal meaning" of § 210(e)(3), 219 U. S. App. D. C., at 15, 675 F. 2d, at 1240, which states in pertinent part:

> "No qualifying small power production facility or qualifying cogeneration facility may be exempted under this subsection from—
>
> .    .    .    .    .
>
> "(B) the provisions of section 210 . . . or 212 of the Federal Power Act . . . or the necessary authorities for enforcement of any such provision under the Federal Power Act . . . ."

The Court of Appeals interpreted § 210(e)(3) of PURPA to mean that FERC may not promulgate a rule requiring utilities to interconnect with qualifying facilities in order to complete purchases and sales the utilities are required to enter into under PURPA, but must instead afford an opportunity for an evidentiary hearing under §§ 210 and 212 of the FPA in the case of each purchase and sale.

While the language of § 210(e)(3) of PURPA can be so interpreted, the purposes of PURPA strongly support the Commission's contrary reading of that provision. The purposes of the statute make it most unlikely that Congress could have intended that an evidentiary hearing be held for

every interconnection necessary to consummate a purchase or sale of electricity authorized by the Act. Evidentiary hearings under § 210 of the FPA entail a determination of whether a proposed interconnection (1) is in the public interest, and (2) would encourage overall conservation of energy or capital, optimize the efficiency of use of facilities and resources, or improve the reliability of the affected utility systems. 16 U. S. C. § 824i(c)(1) (1976 ed., Supp. V). It is highly doubtful that Congress could have intended that the Commission make such a determination every time a qualifying facility seeks to hook up with a utility to complete a purchase or sale under PURPA, for Congress itself determined in enacting PURPA that these purchases and sales are in the public interest, and that the development of cogeneration and small power production will help to conserve energy and capital and ensure the more efficient use of the Nation's resources.

Providing an opportunity for evidentiary hearings before the Commission for every interconnection necessary to complete a purchase or sale under PURPA would seriously impede the very development of cogeneration and small power production that Congress sought to facilitate. Many of the facilities in question are small operations. By definition a small power production facility has a production capacity of no more than 80 megawatts, 16 U. S. C. § 796(17)(A)(ii) (1976 ed., Supp. V), and cogeneration facilities may also be of modest size. Many owners of qualifying facilities would have little incentive to purchase or sell electric energy if they had to go through an evidentiary hearing before FERC in Washington, D. C., every time they needed to hook up with a utility to consummate a purchase or sale. The average cost to FERC of a contested interconnection proceeding is currently more than $57,000, see FERC Notice of Proposed Rulemaking, Docket RM 82–38–000, Fees Applicable to Electric Utilities, Cogenerators, and Small Power Producers 29–30 (Sept. 1, 1982), and the costs to private parties are doubtless

also substantial. If we were to hold that utilities must be provided an opportunity for a hearing whenever a qualifying facility seeks an interconnection in order to effectuate a purchase or sale under PURPA, we would be "imput[ing] to Congress a purpose to paralyze with one hand what it sought to promote with the other." *Clark* v. *Uebersee Finanz-Korporation, A. G.*, 332 U. S. 480, 489 (1947). Cf. *E. I. du Pont de Nemours & Co.* v. *Train*, 430 U. S. 112, 132–133 (1977); *Permian Basin Area Rate Cases*, 390 U. S. 747, 777 (1968).

We agree with the Commission that, in light of the entire statutory scheme, § 210(e)(3) of PURPA may reasonably be interpreted to forbid the Commission to exempt qualifying facilities from being the target of applications under the FPA for orders "requiring . . . [a] physical connection," FPA, § 210(a)(1), but not to forbid the Commission to grant qualifying facilities the right to obtain interconnections without applying for an order under the FPA. The use of the word "exempted" in § 210(e)(3) is consistent with an intent to ensure only that qualifying facilities not be immunized from the requirements that the Commission may impose under §§ 210 and 212 of the FPA. The term "exemption" is ordinarily used to denote relief from a duty or service. See, *e. g.*, Black's Law Dictionary 513 (5th ed. 1979) (to "exempt" is "to relieve, excuse or set free from a duty or service imposed upon the general class to which the individual exempted belongs"). The only duty that §§ 210 and 212 of the FPA directly impose upon any facility is the duty to obey an order "requiring . . . [a] physical connection." Section 212(e) of the FPA expressly states that § 210 of the FPA shall *not* be construed "as requiring any person to utilize the authority of [§ 210] . . . in lieu of any other authority of law." Significantly, the Commission's interconnection rule does not immunize qualifying facilities from the only requirement that §§ 210 and 212 of the FPA do directly impose on them—the requirement that they obey an interconnection order issued

under those provisions. Qualifying facilities remain subject to applications by other facilities for orders requiring them to make interconnections. The Commission's rule simply permits qualifying facilities to take certain steps to require *other parties*, namely, electric utilities, to make interconnections.[12]

The Commission's interconnection rule represents "'a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" *Udall* v. *Tallman*, 380 U. S. 1, 16 (1965), quoting *Power Reactor Development Co.* v. *Electrical Workers*, 367 U. S. 396, 408 (1961). To uphold it, "we need not find that [FERC's] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial pro-

---

[12] The Commission's interpretation also finds support in the indications in the legislative history of §§ 210 and 212 of the FPA that those provisions were intended to address a different situation. Prior to their enactment, the Commission's authority to order interconnections was limited, under § 202(b) of the FPA, 16 U. S. C. § 824a(b), to utilities over which it had regulatory jurisdiction and, except in emergencies, to situations in which a "person engaged in the . . . sale of electric energy" applied for an order directing such a utility to interconnect. Congress was concerned with the refusal of some intrastate utilities to make interconnections with other systems because, had they done so, they would have become part of the interstate system and thereby become subject to the full range of regulation under the FPA. See 124 Cong. Rec. 34763–34764 (1978) (Sen. Metzenbaum); *id.*, at 34770 (Sen. Bartlett); 123 Cong. Rec. 31194 (1977) (Sen. Johnston); *id.*, at 32397–32398 (colloquy between Sen. Johnston and Sen. Domenici). Sections 210, 211, and 212 of the FPA were enacted to give the Commission authority to order interconnections where they will enhance the reliability of the Nation's electric power systems and optimize the use of its generating capacity. At the same time, Congress provided, in § 201(b)(2) of the FPA, 16 U. S. C. § 824(b)(2) (1976 ed., Supp. V), that compliance with orders to interconnect issued under § 210 or § 211 would not subject an entity to regulation by the Commission under any other provision of the Act. There is nothing in the legislative history of §§ 210–212 to suggest that they were intended to provide the exclusive means of obtaining an interconnection.

ceedings." *Unemployment Compensation Comm'n* v. *Aragon*, 329 U. S. 143, 153 (1946). See *Mourning* v. *Family Publications Service, Inc.*, 411 U. S. 356, 371–372 (1973). We need only conclude that it is *a* reasonable interpretation of the relevant provisions. For the reasons stated above, we do conclude that the Commission's interpretation is reasonable and that the Court of Appeals erred in rejecting that interpretation.

## IV

We hold that the Commission did not act arbitrarily or capriciously in promulgating the full-avoided-cost rule or exceed its authority in promulgating the interconnection rule. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL took no part in the consideration or decision of these cases.