**WINDWAY TECHNOLOGIES, INC.,
Welch Motels, Inc., Gregory Sweck-
er, and Beverly Swecker, Appellees,**

v.

**MIDLAND POWER COOPERATIVE,
Appellant.**

No. 02–1113.

Supreme Court of Iowa.

April 1, 2005.

Rehearing Denied May 12, 2005.

Thomas W. Polking and John A. Gerken of Wilcox, Polking, Gerken, Schwarzkopf & Copeland, P.C., Jefferson, for appellant.

Wallace L. Taylor, Cedar Rapids, for appellees Windway Technologies, Inc. and Welch Motels, Inc.

Gregory and Beverly Swecker, Dana, pro se.

Christopher R. Cook, Arlington, Virginia, for amicus curiae Solar Energy Industries Association.

TERNUS, Justice.

The primary issue in this case is whether a nonrate-regulated utility should be required to sell energy to alternate energy producers on a net metering basis. The district court ruled the appellant, Midland Power Cooperative, must connect to wind generators owned by the appellees, Gregory and Beverly Swecker and Welch Motels, Inc., using net metering. When this court first considered Midland's appeal of the district court judgment, we agreed with the district court. Thereafter, we granted Midland's petition for rehearing and withdrew our original opinion. Upon further consideration of the parties' arguments and the pertinent legal authorities, we now reverse the district court's ruling requiring net metering. We affirm, as modified, the court's order requiring Midland to disclose avoided-costs data to the Sweckers and Welch Motels.

I. *Background Facts and Proceedings.*

The Sweckers and Welch Motels, plaintiffs in the action below, purchased wind-powered electric generators from the appellee, Windway Technologies, Inc. They sought to reduce their energy expense by generating their own power. The plaintiffs also hoped to sell any excess energy they produced to Midland. Customers such as the plaintiffs who buy from and sell energy to a utility are known as cogenerators or alternate energy producers (AEPs). The present dispute arose when the Sweckers and Welch Motels sought to connect their generators to the electric distribution system operated by Midland. Midland took the position that purchases and sales of energy by the AEPs should be separately measured and billed. The plaintiffs, on the other hand, wanted an arrangement they describe as "net metering" where only the net purchase or sale is billed.

There has been some confusion in this case over the correct terminology to describe the parties' respective positions. Midland has argued that the arrangement it seeks to impose is "net billing." It appears, however, that the terms "net metering" and "net billing" are used interchangeably to refer to the same method of measuring the power used by a cogenerator over a specified period of time. The Federal Energy Regulatory Commission (FERC) has used the term "net billing" in the following sense:

"Net billing involves only one meter and one net transaction. Under net billing, the [cogenerator] produces power primarily for the owner's needs. However, at times the [cogenerator] generates 'excess' power which is supplied to the utility through the single meter. Other times, the [cogenerator] may not generate sufficient power for the owner's needs and [it] draws power from the utility through the single meter. Electricity flows through the meter in both directions and is netted out and one meter reading [is] made at the end of a billing period."

*MidAmerican Energy Co.,* 94 F.E.R.C. ¶ 61,340, at 62,262 (2001) (order denying request for declaratory order) (citation omitted). The term "net metering" has been used to describe the same process. *See FirstEnergy Corp. v. Pub. Utils. Comm'n,* 95 Ohio St.3d 401, 768 N.E.2d 648, 650 (2002) (defining "net metering" as " 'measuring the difference in an applica-

ble billing period between the electricity supplied by an electric service provider and the electricity generated by a customer-generator which is fed back to the electric service provider'" (citation omitted)).

In contrast, under the approach urged by Midland, two separate measurements would be required—one to measure power flowing from Midland and the other to measure power flowing from the cogenerator. The applicable billing rates would then be separately applied to each measurement and the resulting dollar amounts would be offset against one another. A more appropriate description of Midland's proposed billing system is separate or independent billing, which is the terminology we will use in this opinion. This type of billing is reflected in the tariffs Midland has filed with the Iowa Utilities Board (hereinafter "the utilities board"). *See* Iowa Code § 476.47(2)(*b* ) (2003) (requiring a nonrate-regulated utility to file a tariff with the board outlining the utility's alternate energy purchase program).

Midland advocates for separate billing of power usage because this system would allow Midland to collect its full retail rate for energy sold to the cogenerating customer but pay the customer a smaller sum for the electricity purchased from the cogenerator based on Midland's "avoided costs," an incremental cost figure defined by federal law. *See* FERC Regulations Under the Public Utility Regulatory Policies Act of 1978, 18 C.F.R. § 292.304(a)(2) (2004) (providing utility shall not pay more than its avoided costs for energy purchased from AEPs), § 292.101(b)(6) (defining "avoided costs"). An example will illustrate the advantage to Midland of separate billing. Under the net metering or net billing approach, if each party, during a given billing period, provides the same amount of electricity to the other, their respective power usage would offset

each other and neither party would owe any money to the other. Using the same example under the separate or independent billing approach, the cogenerating customer would owe Midland more than Midland owed the customer because the customer would pay Midland's retail rate for power provided by Midland, while Midland would only pay the customer at its avoided costs for power provided by the customer, a rate that is considerably less than retail.

The plaintiffs originally filed this suit in federal court, alleging, in part, that Midland's tariff setting the rate at which it would purchase energy from cogenerators violated a federal statute, the Public Utility Regulatory Policies Act (PURPA). *See* Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 824a–3 (2000). The federal court remanded the case to state court on the ground that federal courts lack subject matter jurisdiction of a suit involving a nonrate-regulated utility such as Midland. In the Iowa district court, the parties agreed to bifurcate the case for trial and submit some of the issues to the court, saving the balance of the issues for a jury trial. A bench trial was held on the plaintiffs' claim that Midland's tariff violated PURPA, and the district court held (1) the parties are required to use net metering, and (2) Midland must file periodic reports with FERC from which its avoided costs may be determined. Midland sought an interlocutory appeal, which we granted. Our review is for correction of errors of law. *See* Iowa R.App. P. 6.4.

II.  *Net Metering Requirement.*

A.  *Arguments of parties.*  On appeal, Midland argues the trial court erred because (1) net metering is not required under PURPA or state law, and (2) the Iowa courts have no authority to impose requirements on Midland that are not re-

quired by federal or state law. In response, the plaintiffs claim "the district court had the discretion and authority to impose net metering." They point out that net metering will provide incentives for alternate energy production sources, thereby advancing one of the goals of PURPA. *See Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 404–05, 103 S.Ct. 1921, 1924, 76 L.Ed.2d 22, 27 (1983) (stating PURPA "was designed to encourage the development of cogeneration and small power production facilities"). The plaintiffs also rely on FERC's position that net metering does not violate PURPA to support the trial court's ruling.[1]

B. *Applicable law.* We start with a brief examination of the statutory and regulatory framework. PURPA requires FERC to adopt "such rules as it determines necessary to encourage cogeneration and small power production," including rules that require electric utilities to purchase electric energy from qualifying cogeneration facilities. 16 U.S.C. § 824a-3(a)(2). Rates for such purchases have two statutory restrictions: they must be "just and reasonable" to electric consumers of the utility and to the public, and they must "not discriminate against [AEPs]." 16 U.S.C. § 824a-3(b). Congress considered, but did not adopt, a requirement that utilities purchase energy from AEPs on a net metering basis. *See, e.g.,* 145 Cong. Rec. S5291 (1999); 144 Cong. Rec. S7952 (1998).

The rules adopted by FERC require electric utilities to purchase energy from qualifying AEPs. 18 C.F.R. § 292.303. FERC's rules also parrot the two requirements for purchase rates set forth in PURPA and, in addition, state that utilities shall not be required to pay more than avoided costs for any excess energy produced by an AEP. 18 C.F.R. § 292.304(a)(1)-(2). *"Avoided costs* means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6). State regulatory authorities and nonregulated electric utilities were given the responsibility to implement the rules adopted by FERC. 16 U.S.C. § 824a-3(f).

In Iowa the legislature enacted a law requiring all utilities to purchase energy from qualifying AEPs and to file tariffs with the utilities board explaining their program for doing so. *See* Iowa Code § 476.47(1)-(2). Although the legislature provided that rate-regulated utilities' tariffs were subject to the requirements of rules adopted by the utilities board, the statute states that nonrate-regulated utilities' tariffs are to be filed "for informational purposes only." *Id.* § 476.47(2). One rule adopted by the utilities board requires net billing between *rate-regulated* utilities and AEPs. *See* Iowa Admin. Code r. 199—15(11)(5). Midland, as a nonrate-regulated utility, is not subject to this rule.[2] *Id.* With these laws and regulations in mind, we turn to the net metering issue.

---

1. The plaintiffs have argued on appeal that "it would be discriminatory to require rate-regulated utilities in Iowa to provide net metering pursuant to [state regulatory rules] and deny the same to customers of [nonrate-regulated utilities]." We do not think this claim was preserved for review, however. To bolster its conclusion that net metering was appropriate, the trial court mentioned that "[t]here *may* also be an equal protection of law *consideration.*" (Emphasis added.) We do not think the trial court squarely addressed an equal protection claim and therefore we give it no consideration on appeal.

2. Midland is a cooperative owned by its approximately 6800 member customers. As

■ C. *Discussion.* To place our consideration of this issue in context, we note that the underlying claim giving rise to this issue was the plaintiffs' request in their petitions that Midland be ordered to comply with PURPA. Interestingly, the district court did not rule that Midland's tariffs violated PURPA by not providing for net metering. Rather, the court held that net metering did not violate the PURPA provision that a utility could not pay more than its avoided costs for energy purchased from AEPs. The court then concluded that if net metering were not allowed, "PURPA's purposeful passage to render alternative energy production reasonably attractive [would be] shelved."

The implicit conclusion of the district court that net metering is not expressly required by law appears to be correct. The plaintiffs cite no statute, rule, or controlling decision that *requires* a nonregulated utility to use net metering. The FERC order upon which the plaintiffs rely is not to the contrary. In *MidAmerican Energy Co.*, FERC simply held that state laws requiring rate-regulated utilities to use net metering are not *inconsistent* with PURPA. 94 F.E.R.C. at 62,263–64. We have found no federal case or regulatory decision holding that net metering is *required* by PURPA.

Having determined there is no express requirement for net metering, we consider whether there is an implied requirement in PURPA that net metering be used. We think the answer to this question is clearly "no." FERC has repeatedly stated that it would leave the implementation of PURPA to state regulatory authorities and nonregulated utilities, including the determination as to whether to institute net energy billing for AEPs. *See, e.g., Swecker v.*

*Midland Power Coop.,* 87 F.E.R.C. ¶ 61,-187, at 61,721–22 (1999); Order No. 69, Small Power Production and Cogeneration Facilities, Regulations Implementing Section of the Public Utility Regulatory Policies Act of 1978, FERC Statutes and Regulations 1977–1982 ¶ 30,128, at 30,892 (1980), 45 Fed.Reg. 12,231 (1980) [hereinafter Order No. 69]; *see also MidAmerican Energy Co.,* 94 F.E.R.C. at 62,263 ("In implementing PURPA, the Commission ... recognized that net billing arrangements ... would be appropriate *in some situations,* and left the decision of when to do so to state regulatory authorities." (Emphasis added.)). FERC has also stated that nonregulated electric utilities "are to be afforded 'great latitude' in determining 'the manner of implementation'" of FERC's regulations concerning AEPs. *Cogeneration Coalition of America, Inc.,* 61 F.E.R.C. ¶ 61, 252, at 61,925 (1992) (order denying petition for a nationwide investigation). Given the broad discretion granted to regulatory authorities and nonrate-regulated utilities to determine whether and when to use net metering, we conclude it would be wrong to interpret PURPA to require Midland to offer net metering to all AEPs in its tariffs.

Despite the absence of any authority that requires net metering, the plaintiffs argue the trial court had "discretion" to order Midland to use net metering. *See generally* Order No. 69, 45 Fed.Reg. 12,-231 (1980) (noting review of a nonregulated utility's implementation of PURPA may be pursued in a state court forum pursuant to section 210(g) of PURPA); *see also* Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978, 23 F.E.R.C. ¶ 61,304, at 61,644.

such, it is not subject to rate regulation by the utilities board. *See* Iowa Code § 476.1A (stating "electric cooperative corporations and as-

sociations are not subject to the rate regulation authority of the board").

To exercise discretionary authority over a nonregulated utility's implementation of PURPA would place the Iowa courts in the position of acting as a regulatory board for such utilities. We think this role is neither advisable nor necessary.

■ FERC itself has authority "to undertake an enforcement action to require a State regulatory authority *or nonregulated electric utility* to implement [FERC's] regulations." *Tenn. Power Co.,* 77 F.E.R.C. ¶ 61,125, at 61,483 (1996) (order denying petition for enforcement under section 210 of PURPA) (citing 16 U.S.C. § 824a–3(h)(2)) (emphasis added). In the *Tennessee Power* decision, FERC stated that it would most likely use its enforcement power where claim is made that the nonregulated·utility has not implemented FERC's regulations or has implemented them in a manner contrary to PURPA. 77 F.E.R.C. ¶ 61,125, at 61,485. FERC would leave to the states and state judiciaries challenges to the utility's application of implementing regulations, i.e., fact-specific questions. *Id.; Cogeneration Coalition of America, Inc.,* 61 F.E.R.C. ¶ 61,252, at 61,926.

The dispute here clearly falls in the category of an implementation, not an application, issue. The plaintiffs challenge Midland's tariff, not Midland's application of the tariff to particular customers. The arguments they advance in support of their position are not fact-specific to these plaintiffs or to this utility but instead rest on general principles of fairness and the desire to encourage alternate energy production. ·In essence, a decision by our court upholding the district court's decision·would mean that all nonrate-regulated utilities in Iowa would be required to use net metering for all AEPs. Yet neither Congress, FERC, our state legislature, nor the utilities board saw fit to impose a universal requirement on nonregulated utilities to implement net metering.[3]

In conclusion, we decline the opportunity to make a policy decision on whether net metering would be preferable in the situation before us. There are several reasons that support our decision: (1) the specialized and technical nature of the net-metering issue, (2) the absence of any meaningful guidance for case-by-case determinations of when net metering is appropriate and when it is not, (3) the broad precedential effect of requiring net metering in this case, which would be contrary to FERC's position that net metering is appropriate "in some situations," (4) the authority of the Iowa legislature and the utilities board to require net metering for nonregulated utilities and their failure to do so, and (5) the authority of FERC to regulate the implementation of PURPA by nonrate-regulated utilities, including ordering net metering. Federal law gives nonregulated utilities broad discretion to implement PURPA, and we cannot say that Midland's position on net metering is contrary to that law. Therefore, the district court erred when it ordered Midland to use net metering in selling energy to and buying energy from the plaintiffs.

### III. *Filing of Avoided–Costs Data.*

The plaintiffs included in this action a request that Midland produce cost information so that the plaintiffs could compute the avoided-costs component of Midland's billings. The district court ordered Midland to make available its avoided-costs data at least every two years and to file this information with FERC. Midland com-

---

**3.** PURPA does not preclude state regulators from requiring net metering by a utility that is not rate-regulated. *See Swecker v. Midland Power Coop.,* 105 F.E.R.C. ¶ 61,238, at 62,270 (2003) (order granting petition for enforcement action).

plains about both aspects of the court's order.

■ We first reject Midland's argument that the district court lacked authority to enter an order requiring disclosure of the requested information. Because the requested data is pertinent to Midland's charges to the AEPs, it is likewise pertinent to its implementation of PURPA, which requires that rates be "just and reasonable." Ordering the disclosure of this information is certainly within a state court's authority to review a nonregulated utility's implementation of PURPA.

Nonetheless, we think filing the requested data at FERC is unnecessary. FERC does not require any utility to file cost data with it. Moreover, FERC has made it clear that it will not use its enforcement power to determine whether cost data is adequate, but will leave such issues to state courts. It simply serves no purpose to have the data filed with FERC, as FERC does not want it or need it. We think the plaintiffs can obtain the information they need if we simply require Midland to make its cost data available at its office for review by the public, including AEPs. As ordered by the district court, this data shall be updated every two years.

### IV. *Conclusion and Disposition.*

We conclude the district court erred in requiring Midland to use net metering in its dealings with the plaintiffs. Net metering is not required by state or federal law. Therefore, Midland's tariffs do not violate PURPA. Accordingly, we reverse the district court's order that Midland implement net metering.

We affirm the district court's decision ordering Midland to produce cost data for the plaintiffs' examination. We modify the court's decision, however, to provide that this information may be made available at Midland's principal place of business rather than filed with FERC.

This case comes before us on an interlocutory appeal. Therefore, we remand the matter for disposition of the plaintiffs' remaining claims.

**REVERSED IN PART AND AFFIRMED IN PART AS MODIFIED. CASE REMANDED FOR FURTHER PROCEEDINGS.**

All justices concur except CARTER, J., who concurs specially, and LARSON, J., who dissents.

CARTER, Justice (concurring specially).

I agree with the court's conclusion that neither federal nor state law requires that Midland utilize net metering. I join in the court's opinion. I also write separately to point out that federal law actually prohibits the use of net metering.

Section 210(b) of the Public Utility Regulatory Policies Act, 16 U.S.C. § 824a–3(b), provides:

> No such rule prescribed [by the Federal Energy Regulatory Commission (FERC)] ... shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy.

The Supreme Court in *American Paper Institute, Inc. v. American Electric Power Service Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983), has determined that the term "full avoided costs" as used in the regulations is the equivalent of the term "incremental cost of alternative electric energy, used in § 210(d) of [the Act]." *Am. Paper Inst., Inc.*, 461 U.S. at 406, 103 S.Ct. at 1924, 76 L.Ed.2d at 28.

In a regulation adopted to implement this provision, FERC has required that utilities purchase electricity from qualified cogenerators "at a rate equal to the utility's full avoided cost." 18 C.F.R.

§ 292.304(b)(2) (1982). The utility's full avoided cost is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." *Id.* § 292.101(b)(6).

There is no way that net metering will produce a reimbursement to the cogenerator that is reflective of the utility's full avoided cost. Instead, net metering in every instance reimburses the cogenerator on the basis of the utility's retail rate for electricity. This is manifestly not the cost to the utility of the electric energy that, but for the purchase from such cogenerator, the utility would generate or purchase from another source.

LARSON, J. (dissenting).

It is true, as the majority notes, that PURPA does not require net metering. It is certainly not true, however, that PURPA prohibits it as the special concurrence contends. The latter is obvious from the fact that both FERC and the Iowa Utilities Board (IUB) require net metering by all utilities under their jurisdiction. In fact, FERC has expressly ruled that net metering does not violate PURPA. *MidAmerican Energy Co.,* Docket No. EL99–3–000, 94 F.E.R.C. ¶ 61,340 (Mar. 28, 2001).

Under 16 U.S.C. § 824a–3(a), state regulatory agencies are required to implement cogeneration rules for all utilities for which they have "ratemaking authority." Unfortunately for these plaintiffs, they live in an area served by an electric cooperative, and electric cooperatives are not subject to rate regulation by the IUB. A wind generator in an area served by a private utility could economically operate because the utility would be required to net meter. In those areas, net metering would make alternative generation economically feasible, while those in areas served by Midland would not.

The main purpose of PURPA was to encourage alternative sources of energy and to reduce our dependence on fossil fuels. *See Fed. Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 745–51, 102 S.Ct. 2126, 2130–33, 72 L.Ed.2d 532, 537–42 (1982). Midland could, in keeping with the spirit of PURPA, use net metering to encourage alternative electric generation, but it has consistently thwarted cogeneration development. As noted in a September 21, 2004 order (provided to this court by Midland after oral argument to support its rehearing petition), FERC noted it had previously initiated enforcement proceedings against Midland. It said that

> initiating such a proceeding was appropriate because for over five years Midland has abused its role as a "nonregulated electric utility" under PURPA to frustrate Mr. Swecker's attempts to exercise his rights as [an alternative generator].

As a practical matter, if Midland was to allow alternative generation, this would have a negligible impact on its income. Of its 6800 customers, only a small handful of cogenerators are proposed.

PURPA provides leverage on public utilities to accommodate alternative energy producers. 16 U.S.C. § 824a–3(a) provides:

> Not later than 1 year after November 9, 1978, the Commission shall prescribe ... such rules as it determines necessary to encourage cogeneration and small power production ... which rules require electric utilities to offer to—
>
> (1) sell electric energy to qualifying cogeneration facilities and qualifying small power production facilities and

(2) purchase electric energy from such facilities.

Under § 824a–3(b),

[t]he rules prescribed under subsection (a) of this section shall insure that, in requiring any electric utility to offer to purchase electric energy from any qualifying cogeneration facility or qualifying small power production facility, the rates for such purchase—

(1) shall be *just and reasonable to the electric consumers* of the electric utility and *in the public interest,* and

(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

No such rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy.

(Emphasis added.)

It should appear obvious that Midland's charging a cogenerator such as the Sweckers three times what Midland pays the Sweckers for the same commodity is not "just and reasonable." Further, Midland's obstructiveness in encouraging alternative generation frustrates the purpose of PURPA and surely cannot be considered to be "in the public interest."

Midland thumbs its nose at fairness and the goals of PURPA and claims, in effect, that no one can do anything about it. It has successfully dodged the bullet in federal court by claiming that court has no subject matter jurisdiction. *See Windway Techs., Inc. v. Midland Power Coop.,* No. C00–3089MWB, 2001 WL 1248741 (N.D.Iowa Mar.5, 2001). Midland has further been immunized from any control by the IUB, which, if it had rate-making authority, would require net billing, as it does for its regulated utilities. Midland contends, in effect, that this court cannot

grant relief to the plaintiffs without acting as a super utility regulator. However, when a federal court rejects a claim such as this one based on subject matter jurisdiction, that does not mean a utility is free from any judicial enforcement of the rules requiring compliance with PURPA. When a federal district court rejects a case on subject matter jurisdiction grounds, the case is properly heard in state court. *See Greensboro Lumber Co. v. Ga. Power Co.,* 643 F.Supp. 1345, 1374 (N.D.Ga.1986) ("Any subsequent claim that a nonregulated utility has failed to adhere to its own implementation plan in its dealings with a particular qualifying facility must be brought in state court, which has exclusive jurisdiction 'to enforce any requirement' of a nonregulated utility's implementation plan. That this is FERC's interpretation of PURPA's enforcement mechanism is clear." (Citations omitted.)); *see also Snow Mountain Pine Co. v. C.P. Nat'l Corp.,* Docket No. EL84–25–000, 30 F.E.R.C. ¶ 61,293 (Mar. 19, 1985) ("As the Commission has previously noted, complaints regarding an alleged refusal to purchase power from a qualifying facility *and the rates for such purchases are matters properly brought in a State forum.*" (Emphasis added.)); *Roche Prods., Inc.,* 29 F.E.R.C. ¶ 61,098 (Oct. 26, 1984) ("[M]atters of application of [a utility's] rules ... are properly brought before State judicial forums."); Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978, 48 Fed.Reg. 29475, 29476, 23 F.E.R.C. ¶ 61,304, 61,645 (June 27, 1983).

In this case, the plaintiffs do not ask that they be compensated for all electricity generated at the full market rate. That would clearly be contrary to PURPA and the regulations promulgated under it. However, they do ask for the right to make in-kind exchanges of electricity and

to pay to Midland the full market rate only for the excess power used by the plaintiffs. Contrary to Midland's assertion, and the majority's holding, this is a matter properly before an Iowa district court.

This is an interlocutory appeal, and the matter will have to be remanded to the district court on the remaining issues. I believe the district court should be permitted to make an assessment of the evidence in this case regarding whether the rate structure imposed by Midland is just and reasonable under the circumstances and properly serves the public's interests in light of PURPA and FERC rules. I would modify the district court judgment and remand for further proceedings.