IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Submitted on Briefs January 29, 2014

PRACTICAL VENTURES, LLC d/b/a AAA CASH FAST
v.
JAMES NEELY, COMMISSIONER OF THE TENNESSEE
DEPARTMENT OF LABOR AND WORKFORCE DEVELOPMENT,
AND DANYELLE A. McCULLOUGH

Appeal from the Chancery Court of Shelby County
No. CH-11-0349-3      Kenny W. Armstrong, Chancellor

No. W2013-00673-COA-R3-CV - Filed June 19, 2014

This is an appeal from an administrative decision on unemployment benefits. The appellee Tennessee Department of Labor and Workforce Development held that the claimant employee was "constructively discharged" and was therefore eligible for unemployment benefits. The appellant employer filed a petition for judicial review of the administrative decision. The chancery court affirmed, and the employer appeals. We hold that the doctrine of constructive discharge is inapplicable to proceedings under the unemployment compensation statutes. The facts as found by the administrative tribunal support a holding that the employee voluntarily terminated her employment. For this reason, we conclude that the administrative decision awarding benefits to the employee is not supported by substantial and material evidence and is arbitrary and capricious. Accordingly, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J. W.S., and J. STEVEN STAFFORD, J., joined.

Timothy A. Perkins, Memphis, Tennessee, for Plaintiff/Appellant Practical Ventures d/b/a AAA Cash Fast

Robert E. Cooper, Jr., Derek C. Jumper, and Kathryn A. Baker, Nashville, Tennessee, for Defendant/Appellee Tennessee Department of Labor and Workforce Development

## OPINION

### FACTS AND PROCEEDINGS BELOW

Plaintiff /Appellant Practical Ventures is a limited liability company doing business under the name AAA Cash Fast ("Cash Fast"). Cash Fast operates a chain of stores that give automobile title loans and check advances to individuals. The president, owner, and general manager of Cash Fast is Mr. Gordon Ballenger.

In October 2008, Cash Fast hired Defendant Danyelle McCullough as a "store manager" for one of its Memphis area stores. As the store manager, McCullough was the primary employee for that store. When she was at work, she was typically the only employee at the store; she handled Cash Fast's financial transactions with its customers, that is, the title loans and check advances. Occasionally, another employee assisted McCullough at the store, and on McCullough's days off, another employee filled in for her.

McCullough worked at her Cash Fast location on January 25, 2010, and she submitted a closing report that included a summary of the store's loans and transactions for that day. In the course of reviewing the paperwork McCullough submitted for her Cash Fast store, Ballenger noticed a copy of a check that was blank except for the amount of the check. The next day, January 26, 2010, was McCullough's day off, and employee Tonya Moore filled in for her at the store. Concerned about this irregularity, Ballenger contacted Moore and asked her to pull the check and look at it. Moore confirmed to Ballenger that the check was in fact blank except for the amount and told him that she had noticed other discrepancies as well.

Ballenger came to the store to investigate. Ballenger discovered a number of irregularities involving multiple loans and multiple customers. These included loans in the names of customers who, when contacted, said they knew nothing about such a loan. Ballenger began to suspect that McCullough had engaged in fraud.

Ballenger called McCullough on her cell phone. He told her that they had seen some issues with the loans and asked her to come to the store. McCullough told him that she could not come in because she had taken her child for medical treatment.[1] Ballenger told McCullough that he and employee Moore would meet McCullough at her store the next morning, when McCullough was scheduled to work. Ballenger initiated an audit of the store and contacted the district attorney's office.

---

[1]The record indicates that McCullough's daughter was suffering from a chronic medical condition that required regular medical treatments.

The next day, Moore opened the store, and Ballenger was there as well. McCullough called and told Moore that she was running late. Ballenger spoke to McCullough and told her that an investigation of the transactions for her store was underway, that her security code had been removed from the store security system, and that he had contacted the district attorney's office. He told her that she was suspended until further notice and that she needed to turn in her store keys. McCullough responded that she was not concerned and said that she had been planning to quit the following Saturday anyway. McCullough and Ballenger had no further communications. She did not return to work at Cash Fast. McCullough did not return the store keys Ballenger requested.

The Cash Fast audit determined that McCullough's store location suffered a $15,468 loss from the irregularities identified. A warrant was issued for McCullough's arrest and she was charged with seventeen criminal offenses, including embezzlement, identity theft, and forgery. Sixteen of the seventeen charges were later dropped; one forgery charge remained pending before the Grand Jury.

Several months later, on August 3, 2010, McCullough filed an initial claim for unemployment compensation with the Defendant/Appellee Tennessee Department of Labor and Workforce Development ("Department"). At the time, the forgery charge against her remained pending. In McCullough's unemployment compensation claim, she stated that Cash Fast discharged her because she refused to come to work on her day off.

Cash Fast's response to McCullough's unemployment compensation claim asserted that Ballenger told her on January 27, 2010, that she was suspended because of the financial irregularities discovered at her store. It said that McCullough replied to Ballenger that the suspension did not matter because she had intended to quit the following Saturday, January 30, anyway. The Cash Fast response indicated that the employer did not hear from McCullough again until the hearing on the criminal charges and that she was ultimately discharged for financial misconduct.

At the end of August 2010, the Department issued a decision denying McCullough's claim for unemployment benefits. It found that her employment was terminated for misappropriation of company funds and that her actions constituted work-related misconduct that disqualified her from receiving benefits under Tennessee Code Annotated § 50-7-303. McCullough appealed the denial.

On October 28, 2010, the Department's Appeals Tribunal held an evidentiary telephonic hearing.[2] The Department Hearing Officer heard testimony from McCullough, Ballenger, Moore, and another Cash Fast employee, Gloria Jones.

Ballenger testified at the outset of the hearing. He said that McCullough was the primary employee at the store she managed and usually worked by herself at that location. He described reviewing McCullough's closing report for January 25, 2010, which included summaries of the title loan reports and photocopies of the checks written for loans that day. In the report, Ballenger noticed a photocopied check that was "completely blank except for the amount of money." He said the check had "no date, no signature, nothing filled out on the check whatsoever" and added, "that is totally wrong." The next day, January 26, was McCullough's day off, so Ballenger called Moore, who was filling in for McCullough at the store, and asked Moore to pull the check in question. Moore did so and verified that the check was in fact blank. She told Ballenger about several other irregularities as well.

Ballenger said that this information prompted him to go to McCullough's store to investigate. He found numerous irregularities. He contacted McCullough on her cell phone, told her that they had discovered significant problems with the client files, and asked her to come to the store to discuss the discrepancies. When McCullough told him that she could not come in, Ballenger told her that he and Moore would meet her at the store the next day, when McCullough was scheduled to work.

The next day, Ballenger testified, McCullough called the store and told Moore that she was running late. Shortly after that, he said, McCullough called again and asked Moore if Ballenger was there. Ballenger then took the telephone and told McCullough that they had found multiple irregularities, that he had contacted the district attorney's office, and that "we were suspending her pending the results of her audit." He also told her that she needed to turn in her store keys. According to Ballenger, McCullough responded that "she wasn't concerned about the suspension, that she was – she intended to quit the following Saturday, January 30th, anyway. So, she didn't really care about the suspension." Ballenger said he considered this to be McCullough's resignation. He said that she never came back to the store or called after that exchange. McCullough never returned the Cash Fast store keys.

After that, Cash Fast completed the audit and police officers took sworn statements from several Cash Fast customers. A warrant was issued for McCullough's arrest and she was arrested in late February 2010. Several charges of identity theft against McCullough were later dropped, but at least one forgery count was held over for the grand jury to review.

---

[2] Prior to the telephonic hearing, Cash Fast submitted a number of documents that were discussed at length by the witnesses at the hearing. These documents were apparently not submitted into evidence.

Moore testified next. She largely corroborated Ballenger's testimony. Moore could not hear McCullough's end of the telephone conversation in which Ballenger told McCullough that she was suspended because of the financial discrepancies, but Moore said she heard Ballenger say to McCullough, "[Y]ou're telling me that you're quitting, that you was [sic] planning on quitting this Saturday?" In testifying about her research into the irregularities in McCullough's financial reports, Moore described contacting customers who were listed in McCullough's report as having taken out loans. Some of the customers, Moore said, told her they had no idea about the loans they were listed as having taken out. Moore testified about numerous customer loans that she believed McCullough had falsified.

The hearing officer also heard testimony from Cash Fast's lead store manager, Gloria Jones. Jones assisted Ballenger and Moore in an audit of over 300 files at McCullough's store location. Jones said that audit revealed missing checks, altered checks, check numbers that had been used twice, and missing folders. She said she spoke to a number of customers herself, and many of them did not have outstanding loans as McCullough's records indicated. Jones testified that the audit results were out of the ordinary and "alarmed" her.

McCullough testified on her own behalf. She confirmed that she sent Ballenger the store closing documents in question on the night of January 25, after she worked that day. The closing documents included a cash flow sheet and a title loan daily report. The next day, the 26th, was her scheduled day off, and she was scheduled to be back at work on the 27th. McCullough testified that Ballenger contacted her on the 26th to ask her to come in to work "and assist Ms. Moore in my location, because she was having trouble." She said that she told Ballenger that she could not come in that day,[3] but said that if Moore would "leave the files there, I'd look through them in the morning."

The next morning, McCullough said, she called the store and told Moore that she was running late. She said that Ballenger then got on the phone. She described her conversation with Ballenger:

> Mr. Ballenger picked up the – I guess he picked up the other line when me and Ms. Moore was on the line, and I was explaining to him that I'm running a little late. He said, there's – "there's no need to come in." He said, "You[r] store is under investigation. I'm removing your security code." He then went to tell me that eight – the day before, Ms. Moore found a lot of, I guess, discrepancies in my store, and that I was suspended until further notice after he contacted [the] district attorney's office. And then we hung up the phone,

---

[3]McCullough said she was at her daughter's medical appointment.

and then I called him back to ask about my final check, and he laughed in my face and said I'll get my check when he gets his key.

Asked about her response to Ballenger in that conversation, McCullough said:

> . . .[H]e was yelling in the phone, I said – I said, "Gordon, I'm not concerned." I said, "I'm not worried because I know I did nothing wrong in your store." I said, "My daughter's in the hospital. This is the last thing on my mind and you can fire me if you want to, but I was planning on quitting anyway, but you fired me first and I will wait to hear from you." And that was the end of that conversation.

The hearing officer then asked McCullough why she was planning to quit. McCullough responded: "Well, because the hours that I was – my daughter was very sick and Mr. Ballenger – you can't work for him if you can't be there. So, I was taking that time off so my daughter – my daughter was going through surgery." McCullough then addressed a number of the financial irregularities that the Cash Fast witnesses had outlined, explaining why certain documents looked like some customers had loans when in fact they did not. She noted that, at that point, 16 of the 17 charges against her had been dropped. She claimed that she believed that Ballenger was angry at her for refusing to come in to the store on her scheduled day off.

On cross-examination, McCullough confirmed that, in their telephone conversation, Ballenger told her only that she was suspended, not that she was terminated. McCullough maintained that she considered the suspension to be a termination because Ballenger "removed my alarm code and told me to bring – to get his keys to him. . . . That's his procedure when he's terminating someone." She added, "I even asked Mr. Ballenger on the phone, are you firing me? He laughed." That concluded the evidence at the hearing.

On October 29, 2010, the day after the telephonic hearing, the Appeals Tribunal mailed its decision to the parties. The Appeals Tribunal reversed the prior denial of benefits and determined that McCullough was eligible for unemployment benefits. The Appeals Tribunal made the following findings of fact:

> According to the employer's policy, employees are suspended due to possible theft at the store location. During the suspension, the employees are prohibited from working and must return the employer's property. The claimant understood this procedure to mean termination of employment.

On January 25, 2010, the claimant sent her company reports to the owner. On January 26, 2010, after the owner reviewed the reports, he attempted to speak with the claimant about some book keeping discrepancies. When the owner spoke to the claimant, he requested that she report to work on her day off. The claimant refused because she was with her daughter at the hospital. The claimant agreed to meet with the owner on the following day in order to talk about her book keeping style. On January 27, 2010, the claimant was scheduled to work, but she was not at her assigned work location on time. As the claimant was driving into work, she called the employer's personnel and told her that she was running late. After the claimant made the comment, the owner began to speak with the claimant. The owner informed the claimant that he needed the store keys back and that she was suspended pending the outcome of an investigation. The owner made the decision after speaking with the district attorney's office. When the owner finished explaining the company's position on the matter, the claimant informed him that she was thinking about resigning on January 30, 2010 anyway.

Based on these factual findings, the Appeals Tribunal made the following conclusions of law:

> The Appeals Tribunal has determined that the claimant was constructively discharged. The following facts helped the Appeals Tribunal to reach this decision. The owner did not allow the claimant to work and requested the return of the company's property. The owner made this decision after consulting with the district attorney's office. Since the owner denied the claimant the right to work first, the owner discharged the claimant. The burden of proof rests with the employer to establish the claimant engaged in work-related misconduct. The employer has provided insufficient proof. At the time of separation, the claimant did not admit to any inappropriate conduct and no witness[es]' statements were gathered until after the separation.

Thus, the Appeals Tribunal found that Ballenger told McCullough that she was suspended pending investigation of "book keeping discrepancies" and asked her to return her store keys. It found that, in response, McCullough told Ballenger that she was thinking about resigning the following Saturday anyway. Based on these factual findings, the Appeals Tribunal concluded that McCullough was "constructively discharged." It cited the fact that Ballenger "denied [McCullough] the right to work first," and concluded that this amounted to discharging her. Once the Appeals Tribunal held that McCullough was discharged, it then became incumbent on Cash Fast to prove work-related misconduct, and the Appeals Tribunal

found the Cash Fast proof to be "insufficient." For these reasons, the Appeals Tribunal deemed McCullough eligible for unemployment compensation benefits.

Cash Fast appealed this decision to the Department's Board of Review. In its appeal, Cash Fast argued that McCullough was disqualified from receiving benefits because she quit her employment or, in the alternative, she was discharged for work-related misconduct.

In its December 8, 2010, decision, the Board of Review stated the issue on appeal as "whether claimant was discharged for misconduct under TCA §50-7-303(a)(2)." It affirmed and adopted the findings and conclusions of the Appeals Tribunal. The Board of Review explained its decision as follows:

> This employer simply failed to meet its burden of proof. Despite submitting numerous documents to the Tribunal and then again to the Board, none of these documents were admitted into the record as evidence. . . . The employer established that several discrepancies were found in the store while the claimant was off work one day but failed to establish if the claimant was involved or even why it was initially believed the claimant was involved.
>
> The employer found discrepancies and contacted customers who confirmed that they had not been into the store or initiated a loan since a certain date, but that is the extend [sic] of the facts offered by the employer. The employer fails to establish the claimant's involvement in the events. . . . [T]he Board of Review is not free to make a case for a party by assuming facts not entered in the record and has no basis on which to assume the claimant was ever involved in the wrongdoing. . . . Most testimony, if not all, offered by the employer was without context and never tied back [into] the claimant.

Thus, the Board of Review addressed only whether Cash Fast had proven that McCullough engaged in work-related misconduct. It did not address the issue of whether McCullough quit or was discharged, other than to adopt the findings and conclusions of the Appeals Tribunal. It agreed with the Appeals Tribunal that Cash Fast did not prove work-related misconduct, so it agreed that McCullough was eligible for benefits.

In response, Cash Fast filed a petition to rehear in which it sought an evidentiary hearing and an opportunity to present additional evidence on whether McCullough resigned her employment and whether she breached Cash Fast corporate policies. This request was denied.

Cash Fast then filed a petition for judicial review in the Chancery Court of Shelby County, Tennessee. In response, McCullough asked the trial court to dismiss the petition.

On January 24, 2013, the trial court held a hearing on the Cash Fast petition. The trial court took no new evidence; the parties argued based on the evidence submitted in the hearing before the Appeals Tribunal.[4] The hearing focused on the Cash Fast contention that McCullough was neither discharged nor "constructively discharged," but instead voluntarily quit. Cash Fast argued that this was a question of law to be decided by the trial court based on the facts in the record.

On February 14, 2013, the trial court entered its order on the petition for judicial review. The trial court's order emphasized the standard of review of the Department's administrative decision, set forth in Tennessee Code Annotated § 50-7-304, and commented that the standard mandated "substantial judicial deference" to the administrative decision. (Emphasis removed). The order stated:

> Based upon the record as a whole, the Court concludes that the decision of the [Department] is supported by substantial and material evidence. The Court finds that there is evidence to support the finding that the employee was effectively terminated. Further, the Court holds that the decision of the [Department] is not arbitrary or capricious. Finally, the Court finds that the record contains insufficient evidence that the employee engaged in misconduct that would disqualify her from eligibility for unemployment compensation benefits.

Thus, the trial court held that the record supported the Department's finding that Cash Fast "effectively terminated" McCullough, and that Cash Fast had not shown disqualifying work-related misconduct. From this order, Cash Fast now appeals.

## ISSUES PRESENTED AND STANDARD OF REVIEW

On appeal, Cash Fast raises the following issues:

> Whether the Board of Review acted arbitrarily and capriciously when it failed to consider [Cash Fast's] argument that [McCullough] voluntarily quit without good cause?

---

[4]The record includes a statement of the evidence for the Chancery Court hearing.

Whether the Agency erred in its interpretation and application of the "good cause connected with the claimant's work" standard under Tennessee Code Annotated § 50-7-303(a)(1) when it concluded that suspension of an employee pending an investigation into the employee's potential misconduct constitutes "good cause" justifying resignation?

Whether the Agency acted arbitrarily and capriciously in finding that "none of the Employer's documents were admitted into the record as evidence," when the administrative hearing transcript shows that everyone– including the Hearing Officer– heavily relied on the Employer's records throughout the hearing?

On cross-appeal, the Department raises a single issue: "Whether the Chancery Court correctly found substantial and material evidence in the record and reasonable basis in law affirming the Department's decision granting [McCullough] unemployment benefits."

In an appeal from an agency decision regarding unemployment compensation benefits, both the trial court and the appellate court apply the same standard of review, set forth in Tennessee Code Annotated § 50-7-304(i)(2):

(2) The chancellor may affirm the decision of the commissioner or the chancellor may reverse, remand or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(A) In violation of constitutional or statutory provisions;

(B) In excess of the statutory authority of the agency;

(C) Made upon unlawful procedure;

(D) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(E) Unsupported by evidence that is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 50-7-304(i)(2). The task of the appellate court under this statute is to take a "fresh look" at the Department's decision, not the decision of the lower court. *See Sims v. Culpepper*, No. 01A01-9605-CH-00229, 1998 WL 32703, at *3 (Tenn. Ct. App. Jan. 30,

1998) (citing ***Gilley v. Culpepper***, No. 01A01-9611-CH-00521, 1997 WL 284625, at *2 (Tenn. Ct. App. May 30, 1997)). Accordingly, in this appeal, we confine our review to the decisions of the Appeals Tribunal and the Board of Review.

In reviewing the agency's decision, the appellate court must "review the entire record, including any proof that fairly detracts from the agency's decision, to determine whether it is arbitrary, capricious, characterized by an abuse of discretion, or unsupported by substantial and material evidence." ***Newman v. Davis***, No. W2013-00696-COA-R3-CV, 2014 WL 507100, at *7 (Tenn. Ct. App. Feb. 7, 2014) (quoting ***Armstrong v. Neel***, 725 S.W.2d 953, 955 (Tenn. Ct. App.1986)); Tenn. Code Ann. § 50-7-304(i)(2)(D) and (E). "The court may not substitute its judgment for that of the Commissioner's Designee as to the weight of the evidence on questions of fact, and the decision of the Commissioner's Designee may not be reversed, remanded or modified except for errors affecting the merits of the final decision of the Commissioner's Designee." ***Newman***, 2014 WL 507100, at *7; Tenn. Code Ann. § 50-7-304(i)(3).

Substantial and material evidence has been described as " 'something less than a preponderance of the evidence, but more than a scintilla or glimmer.' " ***Dura Auto. Sys., Inc. v. Neeley***, No. M2009-00908-COA-R3-CV, 2010 WL 204090, at *2 (Tenn. Ct. App. Jan. 21, 2010) (quoting ***Dickson v. City of Memphis Civil Serv. Comm'n***, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005); ***Wayne County v. Tenn. Solid Waste Disposal Control Bd.***, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988)). "[A] reviewing court should not apply Tenn. Code Ann. § 4-5-322(h)(5)'s 'substantial and material evidence' test mechanically. Instead, the court should review the record carefully to determine whether the administrative agency's decision is supported by 'such relevant evidence as a rational mind might accept to support a rational conclusion.' " ***Jackson Mobilphone Co., Inc. v. Tenn. Pub. Serv. Comm'n***, 876 S.W.2d 106, 111 (Tenn. Ct. App. 1993) (citing ***Clay County Manor v. State Dep't of Health & Environment***, 849 S.W.2d 755, 759 (Tenn. 1993)).

Broadly, the "arbitrary and capricious" standard requires the court to determine whether the administrative agency has made a clear error in judgment. ***Jackson Mobilphone***, 876 S.W.2d at 110-11 (citing ***Amer. Paper Inst. v. Amer. Elec. Power Serv. Corp.***, 461 U.S. 402, 413; 103 S. Ct. 1921, 1928 (1983); ***Citizens to Preserve Overton Park, Inc. v. Volpe***, 401 U.S. 402, 416; 91 S.Ct. 814, 823-24 (1971)). "An arbitrary decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the case without some basis that would lead a reasonable person to reach the same conclusion." ***Jackson Mobilphone***, 876 S.W.2d at 111 (internal citation omitted).

Where the facts are undisputed, the issue of whether an unemployment compensation claimant voluntarily quit his or her employment presents a question of law. ***McPherson v.***

-11-

***Stokes***, 954 S.W.2d 749, 751 (Tenn. Ct. App. 1997) (citations omitted). Questions of law are reviewed on appeal *de novo,* with no presumption of correctness in the decision below. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 744-45 (Tenn. 2002).

**ANALYSIS**

Tennessee's unemployment statutes were enacted to ameliorate "the harsh economic effects of involuntary unemployment on workers and their families." ***Sims***, 1998 WL 32703, at \*2 (citing Tenn. Code Ann. § 50-7-102(a)). Consequently, the statutes governing unemployment compensation "should be construed liberally in the employee's favor and . . . the disqualification provisions in the statutes should be construed narrowly." ***Newman***, 2014 WL 507100, at \*7 (citing ***Armstrong***, 725 S.W.2d at 955; ***Weaver v. Wallace***, 565 S.W.2d 867, 869-70 (Tenn. 1978)); ***see also Cherry v. Suburban Mfg. Co.***, 745 S.W.2d 273, 275 (Tenn. 1988). However, this latitude is extended only to fulfill the legislature's intent to assist those who are involuntarily unemployed through no fault of their own. Accordingly, "workers who leave their jobs 'voluntarily without good cause connected with . . . [their] work' are not entitled to receive unemployment compensation benefits." ***Sims***, 1998 WL 32703, at \*2 (citing Tenn. Code Ann. § 50-7-303(a)(1)).

We consider first Cash Fast's argument that the Department erred in failing to find that claimant McCullough is disqualified from receiving benefits under Tennessee Code Annotated § 50-7-303(a)(1) because she "left [her] most work recent work voluntarily without good cause connected to [her] work." Tenn. Code Ann. § 50-7-303(a)(1)(A). Cash Fast contends that the Board of Review acted arbitrarily in failing to address this issue in its review of the decision of the Appeals Tribunal, and that McCullough voluntarily quit her position without "good cause" within the meaning of the statute. Cash Fast asserts that McCullough was obliged to participate in the investigation of the store's financial discrepancies, as a reasonable and necessary step to protect her employment, and she failed to do so. Cash Fast also insists that the Department erred in finding that McCullough was "constructively discharged."

In its appellate brief, the Department argues: "On appeal, [Cash Fast] has not asserted that the Department's finding of effective termination was unsupported by substantial and material evidence in the record. Accordingly, any such argument challenging the termination finding is waived, pretermitting [Cash Fast's] first and second issues for review." We are puzzled by the Department's position; our review of the appellate briefs filed by Cash Fast does not support the contention that these issues are waived. The Department chose not to address the merits of the issue, so we proceed to analyze the issue without substantive input from the Department.

-12-

An initial observation is in order. The Appeals Tribunal held that McCullough was "constructively discharged," and this holding was adopted by the Board of Review. The doctrine of constructive discharge first arose under the National Labor Relations Act and is applicable under state and federal laws prohibiting discrimination on the basis of race, color, religion, sex, or national origin. *Campbell v. Florida Steel Corp*., 919 S.W.2d 26, 33-34 (Tenn. 1996). Under the constructive discharge doctrine, an employer may be deemed to have "discharged" an employee who resigned employment if the employee "resigns in order to escape intolerable and illegal employment requirements to which the employee has been subjected because of his race, color, religion, sex, or national origin." *Id.* at 34. To prove constructive discharge, the plaintiff employee must prove "that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id*.

In a civil case alleging discrimination, the doctrine of constructive discharge presupposes that the plaintiff resigned employment and the focus is on whether the employer caused the resignation by allowing intolerable discriminatory conditions to exist. In contrast, in an administrative proceeding in which a claimant resigns and seeks unemployment benefits, the focus is on whether the claimant can show under the unemployment benefit statutes that he quit for "good cause connected with the claimant's work." Tenn. Code Ann. § 50-7-303(a)(1)(A). Thus, the legal theories for the two types of cases have different elements and standards.[5] The doctrine of constructive discharge is inapplicable in an administrative unemployment compensation proceeding. As can be seen from our discussion below, use of the term "constructive discharge" in an unemployment compensation administrative proceeding muddies the analysis and should be avoided.

We now consider the Department's holding. Initially, we have to determine whether the Department held that McCullough "left [her] . . . work voluntarily" or was "discharged" by Cash Fast. Tenn. Code Ann. § 50-7-303(a)(1) and (2). The Appeals Tribunal held that McCullough was "constructively discharged," and this holding was adopted by the Board of Review. As noted above, the phrase "constructive discharge" is based on the premise that the employee resigned from her employment, albeit under conditions that essentially left the employee with little choice. The Appeals Tribunal also made the factual finding that, in her January 27, 2010 conversation with Ballenger, McCullough "informed him that she was thinking about resigning on January 30, 2010 anyway." The Department's use of the term "constructive discharge," taken together with the factual finding that McCullough told

---

[5]In some situations, there may be overlap. For example, circumstances in which a unemployment compensation claimant quits for "good cause connected with the claimant's work" may on occasion also constitute facts that would support a finding that the employee was "constructively discharged" under discrimination statutes. Regardless, they involve separate statutes and should be analyzed as such.

Ballenger that she was planning to resign anyway, indicates that the Department concluded that McCullough quit her employment with Cash Fast. However, the Appeals Tribunal also held that, because Cash Fast "denied [McCullough] the right to work first, [Cash Fast] *discharged* the claimant." (Emphasis added). It went on to hold that Cash Fast failed to carry its burden of proving work-related misconduct, which is only required under the statute if the employee is discharged from her employment. This indicates that the Department held that Cash Fast discharged McCullough from her employment. Since the Department's holding is unclear, we will independently analyze the evidence on whether McCullough quit or was fired.

From our review of the witness testimony, the salient facts are essentially undisputed. On January 26, 2010, Ballenger contacted McCullough and asked her to come in to discuss discrepancies in the store's financial paperwork; McCullough was unable to do so and they agreed to discuss the issues the next day at the store. In their January 27, 2010 conversation, Ballenger told McCullough that Cash Fast was investigating irregularities in the store's financial reports and had been in contact with the local district attorney's office. Ballenger told McCullough that her store security code had been changed and that she was suspended pending the outcome of the investigation. He told her that she needed to return her keys to the store. In response, McCullough told Ballenger that she was "not concerned" about the suspension, and that she had been planning to resign the following Saturday anyway. It is undisputed that Ballenger and McCullough had no further contact outside of the legal proceedings and that McCullough never turned in her store keys. The factual findings made by the Appeals Tribunal[6] and adopted by the Board of Review are in line with this outline of the facts from the witnesses' testimony.

As noted above, where the facts are undisputed, the issue of whether an unemployment compensation claimant voluntarily quit his or her employment presents a question of law. *McPherson*, 954 S.W.2d at 751. Consequently, we address this issue as a question of law, based on these undisputed facts.

The Appeals Tribunal did not make a factual finding that Ballenger told McCullough on January 27, 2010 that he was terminating her employment. It found only that Ballenger told McCullough that she was suspended pending the outcome of the investigation. Black's Law Dictionary defines the term "suspend" as "[t]o interrupt; postpone; defer" or "[t]o temporarily keep (a person) from performing a function [or] holding a job. . . ." *See Black's Law*

---

[6]The Appeals Tribunal referred to the financial irregularities Ballenger and Moore uncovered as "some book keeping discrepancies" and said that Ballenger asked McCullough to come to the store to talk to him "about her book keeping style."

-14-

*Dictionary* 1584 (9th ed. 2009) ("suspend"). The meaning of "discharge" was addressed by our Supreme Court in the context of a claim of retaliatory discharge:

> "Termination of employment" is defined as "[t]he complete severance of an employer-employee relationship." Black's Law Dictionary 1482 (7th ed.1999). "Discharge," in the context of an employment relationship, is defined as "[t]he firing of an employee." *Id.* at 475. . . . Thus, the plain and ordinary meaning of the words "discharged" and "terminated" is a complete severance of the employment relationship.

*Harman v. Univ. of Tenn.*, 353 S.W.3d 734, 738 (Tenn. 2011) (citing *Howard v. Life Care Ctrs. of Am., Inc.*, No. E2004-00212-COA-R3-CV, 2004 WL 1870067, at *5 (Tenn. Ct. App. Aug. 20, 2004) (for an employee to be "terminated" "clearly require[s] an act on the part of the employer to end the employment relationship.").

The facts in this case do not support a finding that Ballenger discharged McCullough in their January 27, 2010 conversation. The Appeals Tribunal pointed to the fact that Ballenger "did not allow the claimant to work and requested the return of the company's property." Explaining the basis for finding that Ballenger discharged McCullough, the Appeals Tribunal said that Ballenger "denied the claimant the right to work first." These facts, however, are consistent with suspension, that is, temporarily keeping McCullough from performing her work for Cash Fast.[7] The facts do not support a holding that Ballenger's actions on January 27, 2010 amounted to anything other than what he said, suspension of McCullough's employment.

On appeal, Cash Fast argues that an affirmance by this Court of the Department's holding that Ballenger discharged McCullough, where Ballenger told McCullough that her employment was suspended pending the outcome of the company's investigation and asked her to return her store keys, would leave employers unable to suspend an employee under the unemployment statutes. We agree. Suspension of employment is an appropriate response where, as here, the employer discovers irregularities regarding an employee whose work involves financial responsibilities and needs time to investigate. The reasoning of the Appeals Tribunal – that Ballenger's actions amounted to discharge because he "denied the claimant the right to work first" – is at odds with common sense. McCullough's job required her to handle all of the financial transactions for her store location, and the majority of the

---

[7]McCullough testified that she had seen Ballenger change the security code and ask for the return of store keys in the course of terminating an employee, so she perceived on January 27, 2010 that Ballenger was terminating her employment. This does not change the fact that she was told only that her employment was suspended at that time, and Ballenger's actions are consistent with suspension.

time she was the sole employee at that store. To do anything less than suspend McCullough's employment, including changing her security code and requesting the return of her store keys, would have been irresponsible under the circumstances. The choice to suspend McCullough, instead of simply terminating her, gave Cash Fast the opportunity to investigate and consider the matter, and it gave McCullough the opportunity to explain the irregularities to Cash Fast and perhaps keep her job. If this Court were to affirm the Department's holding that Ballenger's actions constituted termination of McCullough's employment, it would in effect remove suspension of employment from the arsenal of tools available to employers. This we decline to do.

While the undisputed facts do not support a holding that Cash Fast discharged McCullough, they do support a holding that McCullough voluntarily ended her employment. As discussed in *McPherson v. Stokes*, an employee's failure to take necessary and reasonable steps to protect her employment amounts to a voluntary termination of employment:

> An employee need not form a specific intent to quit his or her job to be disqualified to receive unemployment compensation benefits under Tenn. Code Ann. § 50-7-303(a)(1). Courts will find that an employee has voluntarily terminated employment if the employee fails to take all necessary and reasonable steps to protect his or her employment. Accordingly, a voluntary act or failure to act with knowledge that termination may follow can be considered a voluntary leaving.

*McPherson*, 954 S.W.2d at 751 (internal citations omitted). In this case, on January 26, 2010, Ballenger told McCullough that he wanted her to come to the store to explain the irregularities that had been discovered. In the January 27, 2010 conversation between Ballenger and McCullough, he suspended her employment pending the outcome of the investigation into the irregularities and asked her to return her store keys. McCullough could have responded by telling Ballenger that she would cooperate with the Cash Fast investigation. Instead, she responded by telling Ballenger that the suspension did not concern her because she was planning to resign the following Saturday anyway. After the January 27th telephone call, McCullough still could have reached out to Ballenger to provide Cash Fast with the explanations of the financial irregularities that she gave in her testimony to the Appeals Tribunal. With the benefit of hindsight, we can see that such efforts may not have been successful.[8] No matter. We view the facts from the perspective of the parties at the

---

[8]An employee's resignation, even if based on a reasonable belief that involuntary termination is imminent, constitutes a voluntary quit without good cause attributable to the employer, which disqualifies the employee from receiving unemployment compensation benefits. *See Barner v. Phillips*, No. M2013-01180-COA-R3-

(continued...)

time, not with hindsight on whether the employee's efforts to retain her job would have ultimately succeeded. McCullough's remark, that she was planning to resign in a few days anyway, can be reasonably viewed as voicing a specific intent to quit her job.[9] Regardless, where she made no effort to cooperate with the employer's investigation or explain the irregularities brought to her attention, and indeed did not even return the store keys to the employer as requested, her actions as a whole evince a choice not to "take all necessary and reasonable steps to protect . . . her employment." *McPherson*, 954 S.W.2d at 751.

Thus, we hold that the undisputed facts support a finding that McCullough voluntarily terminated her employment. As such, we must conclude that the Department's holding that McCullough is eligible for unemployment compensation benefits is not supported by substantial and material evidence and is arbitrary and capricious. For this reason, we must reverse the trial court's affirmance of the Department's decision to award unemployment compensation benefits to McCullough. All other issues raised on appeal are pretermitted by this holding.

---

[8](...continued)
CV, 2014 WL 1852563, at *6-7 (Tenn. Ct. App. May 5, 2014) (citing *Frogge v. Davenport*, 906 S.W.2d 920, 924 (Tenn. Ct. App. 1995)); *see also* 76 Am. Jur. 2d *Unemployment Compensation* § 132 (2014).

[9]McCullough did not contend in the administrative proceeding, and the Department does not contend in this appeal, that she voluntarily quit for "good cause" connected with her work. Moreover, although McCullough indicated in her testimony that she was planning to resign for reasons related to her daughter's illness, she did not testify that she had ever told Ballenger that the scheduling problems related to her daughter's illness would force her to resign, or made any effort to work out the issue with Cash Fast to enable her to remain employed. "To be entitled to unemployment compensation benefits for voluntarily quitting a job for good cause, the claimant must have explored all viable options before making the decision to quit." 76 Am. Jur. 2d *Unemployment Compensation* § 102 (2014). "[I]n order for a claimant to recover benefits following a voluntary termination, the claimant must, among other things, make a reasonable effort to preserve his employment. The failure to attempt to resolve issues with an employer before quitting will preclude the grant of benefits. *Pastore v. Unemployment Compensation Bd. of Review*, No. 1209 C.D.2012, 2013 WL 3960884, at *1 (Pa. Commw. Ct. Jan. 14, 2013) (citing *Craighead-Jenkins v. Unemployment Comp. Bd. of Review*, 796 A. 2d 1031, 1033 (Pa. Commw. Ct. 2002) (footnote omitted). Under these circumstances, even if McCullough claimed that she quit for good cause, the evidence in the record is insufficient to support such a holding.

**CONCLUSION**

The decision of the trial court is reversed. Costs on appeal are assessed against Appellee Tennessee Department of Labor and Workforce Development, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE