# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-2186

_____

Gregory R. Swecker; Beverly F. Swecker

*Plaintiffs - Appellants*

v.

Midland Power Cooperative; Central Iowa Power Cooperative

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: June 11, 2015
Filed: October 6, 2015

_____

Before LOKEN, BYE, and KELLY, Circuit Judges.

_____

LOKEN, Circuit Judge.

Beverly and Gregory Swecker own a farm in Iowa that has a wind generator and is a qualifying power production facility ("QF") certified by the Federal Energy Regulatory Commission ("FERC"). The Sweckers sell surplus electric energy to Midland Power Cooperative at a rate established by the Iowa Utilities Board ("IUB"), implementing FERC rules and regulations. See 16 U.S.C. § 824a-3(f). For more than a decade, the Sweckers and Midland have litigated rate disputes in state court, federal

court, and before FERC and the IUB.[1]  In this round of their ongoing battle, the Sweckers appeal the district court's[2] dismissal of their suit against Midland and its primary supplier, Central Iowa Power Cooperative ("CIPCO"), seeking declaratory and injunctive relief requiring Midland "to purchase available energy from plaintiffs . . . at Midland's full avoided cost, rather than CIPCO's avoided cost."  Reviewing the grant of a Rule 12(b)(6) motion to dismiss *de novo*, we affirm.  See Briehl v. Gen. Motors Corp., 172 F.3d 623, 627 (8th Cir. 1999) (standard of review).

## I. Factual and Regulatory Background

**A.**  One purpose of the Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95-617, 92 Stat. 3117 ("PURPA"), was to "provid[e] for increased conservation of electric energy, increased efficiency in the use of facilities and resources by electric utilities, and equitable retail rates for electric consumers."  16 U.S.C. § 2601(1).  "Section 210 of PURPA's Title II, 92 Stat. 3144, 16 U.S.C. § 824a-3, seeks to encourage the development of cogeneration and small power production facilities."  FERC v. Mississippi, 456 U.S. 742, 750 (1982).  To overcome the reluctance of traditional electric utilities to purchase power from nontraditional QFs, § 210 directs FERC to promulgate rules that require electric utilities to offer to purchase electric energy from small power production facilities.  16 U.S.C. § 824a-3(a)(2).  FERC may initiate action in federal court to enforce these rules, and QFs

---

[1]See Swecker v. Midland Power Coop., 142 FERC ¶ 61,207, 2013 WL 1182419 (Mar. 21, 2013) (Swecker); Swecker v. Midland Power Coop., 137 FERC ¶ 61,200, 2011 WL 6523727 (Dec. 15, 2011); Windway Techs., Inc. v. Midland Power Coop., 696 N.W.2d 303 (Iowa 2005); Office of Consumer Advocate v. Iowa Utils. Bd., 656 N.W.2d 101 (Iowa 2003); Windway Techs., Inc. v. Midland Power Coop., No. C00-3089MWB, 2001 WL 1248741 (N.D. Iowa Mar. 5, 2001).

[2]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

such as the Sweckers may sue if FERC declines a request to act. 16 U.S.C. § 824a-3(h); Mississippi, 456 U.S. at 751.

PURPA provides that the rate at which electric utilities purchase a QF's power "shall be just and reasonable to the [customers] of the electric utility" and bars FERC from prescribing a rate that "exceeds the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a-3(b). As the House committee report explained, "The provisions of [§ 210] are not intended to require the rate payers of a utility to subsidize cogenerators or small power producers." H.R. Rep. No. 95-1750, at 98 (1978), reprinted in 1978 U.S.C.C.A.N. 7797, 7832. The statute defines "incremental cost of alternative electric energy" as "the cost to the electric utility of the electric energy which, but for the purchase from [the] small power producer, such utility would generate or purchase from another source." § 824a-3(d). The FERC regulations adopted this definition in defining the term here at issue, "avoided costs."[3]

FERC enacted Rules 303 and 304 to implement § 210 of PURPA. See Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp., 461 U.S. 402, 406-07 (1983). Rule 303 provides that "[e]ach electric utility shall purchase, in accordance with [Rule 304], any energy and capacity which is made available from a qualifying facility: (1) Directly to the electric utility; or (2) Indirectly to the electric utility in accordance with paragraph (d) of this section." 18 C.F.R. § 292.303(a). Rule 304 reiterates the statutory mandates regarding rates and provides that a rate equaling avoided costs satisfies PURPA. §§ 292.304(a), (b)(2). Other regulations permit parties to agree upon a rate different than avoided costs. See 18 C.F.R. § 292.301(b)(1). It is undisputed that Midland is an "electric utility" under PURPA and thus subject to these obligations. See 16 U.S.C. § 2602(4).

---

[3]"Avoided costs means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6).

**B.**  Midland is a retail electric distribution cooperative owned by its member customers.  Midland is a member of and buys its power from CIPCO, a generation and transmission cooperative that supplies the wholesale power requirements of its thirteen rural electric and municipal electric cooperative members in the distribution territories they serve.  Thus, CIPCO is considered to be Midland's "all-requirements supplier."  Swecker v. Midland, 2011 WL 6523727, at *3.  As a non-profit cooperative, Midland is a "nonregulated public utility" under Iowa and federal law, a misnomer, but one of jurisdictional significance.  See 16 U.S.C. § 2602(9) & (18); Iowa Code § 476.1A.

One issue FERC needed to address in implementing § 210 of PURPA was the challenge posed by all-requirements contracts, namely, "that the obligation to purchase from qualifying facilities under this section might conflict with contractual commitments . . . requiring [utilities] to purchase all of their requirements from a wholesale supplier."  Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214, 12,219 (Feb. 25, 1980) ("Order No. 69").  More specifically, when setting the rate at which an all-requirements utility such as Midland must purchase from a QF such as the Sweckers, should the FERC-prescribed maximum rate be the avoided costs of Midland -- the rate at which it purchases from its all-requirements supplier, CITCO -- or CITCO's avoided costs, a lower rate?

In City of Longmont, 39 FERC ¶ 61,301, 1987 WL 117113, at *3 (June 16, 1987), FERC rejected the QF's argument that the avoided cost rate is the cost all-requirements customers pay their supplier because "the generation avoided by the [customers when they] purchase from QFs would be the energy and capacity cost avoided" by their all-requirements supplier.  In Carolina Power & Light Co., 48 FERC ¶ 61,101, 1989 WL 262068, at *5-6 (July 25, 1989), applying City of Longmont, FERC explained why the supplying utility's avoided costs rate, not the rate charged by the supplying utility to an all-requirements customer, should apply:

[I]n Order No. 69, we discussed the ramifications of a QF selling to a full requirements customer instead of selling to that customer's supplying utility. We recognized that only the full requirements supplier . . . would be in a position to avoid constructing or running generation facilities. We were concerned that in cases where a full requirements supplier's wholesale rate exceeds its avoided costs, QFs may attempt to sell to the full requirements customer instead of the full requirements supplier, claiming the supplier's full requirements rate as the avoided cost. In such circumstances, it was determined that the full requirements rate should be adjusted so that the full requirements supplier will be in the same position as if it had purchased power directly from the QF.

Another aspect of the all-requirements contract issue was addressed in Rule 303(d), which provides an alternate means by which an electric utility can meet its all-requirements obligation without hindering small power production:

Under paragraph (d), if the qualifying facility consents, an all-requirements utility which would otherwise be obligated to purchase energy or capacity from the qualifying facility would be permitted to transmit the energy or capacity to its supplying utility. In most instances, this transaction would actually take the form of the displacement of energy or capacity that would have been provided under the all-requirements obligation. In this case, the supplying utility is deemed to have made the purchase and, as a result the all-requirements obligation is not affected.

Order No. 69, 45 Fed. Reg. at 12,219.

**B. Relevant Procedural History**

In this complex regulatory universe, federal district courts have exclusive jurisdiction over "implementation" claims, where the issue is whether a non-regulated utility such as Midland has improperly implemented the PURPA regulations. State

courts exercise jurisdiction over "as-applied" claims, for example, claims challenging the calculation of a specific avoided costs rate. See 16 U.S.C. §§ 824a-3(f), (g), 2633(a), (c).

After an Iowa state court set Midland's avoided costs at 2.5394 cents per kilowatt hour in 2002, the Sweckers and Midland entered into an Agreement for Electric Service to a Qualifying Facility that set the avoided cost rate at 2.5394 cents per kWh.[4] Litigation continued. The Sweckers argued before FERC that the Agreement inappropriately adopted a rate that was "based on false information provided by Midland." FERC determined that the "Agreement constitutes a reasonable resolution of this proceeding." Swecker v. Midland Power Coop., 108 FERC ¶ 61,268, 2004 WL 2106368, at *4-5 (Sept. 21, 2004). In Windway Techs., Inc. v. Midland Power Coop., 732 N.W.2d 887 (table), 2007 WL 752278, at *4-5 (Iowa App. Mar. 14, 2007), state courts rejected the Sweckers' attempt to relitigate Midland's avoided costs in pursuing a claim for damages. In 2011, the IUB declined the Sweckers' request to relitigate the rate issue and Midland's avoided costs. Swecker v. Midland Power Coop., No. FCU-2011-0008, 2011 WL 1589086, at *5 (I.U.B. Apr. 22, 2011).

Unsuccessful in these "as-applied" claims, the Sweckers sought federal relief, petitioning FERC to commence an enforcement action in federal court. FERC instead issued a Notice of Intent Not To Act, explaining that the Sweckers "ask that the Commission . . . declare that Midland's avoided-cost rate should be based on what Midland pays its full-requirements wholesale supplier," and rejecting this contention:

> In Order No. 69, the Commission determined that the avoided cost of a
> full requirements customer is the avoided cost of the full requirements

---

[4]According to pleadings and attached exhibits, Midland pays CIPCO more for energy than it pays the Sweckers under this Agreement, with the rate it paid CIPCO between years 2001 and 2011 ranging from 4.98 cents to 6.37 cents per kWh.

customer's supplier because it is the supplier that avoids generation when the full requirements customer purchases from a QF. The Commission has consistently followed this approach. Given that the rate the Sweckers seek is inconsistent with our precedent, we see no reason why we should initiate an enforcement proceeding on behalf of the Sweckers to establish an avoided-cost rate methodology inconsistent with our precedent. Moreover, the rate that Midland currently pays the Sweckers is the rate that the Sweckers agreed to in the 2004 Settlement Agreement -- a settlement approved by the Commission.

Swecker, 2013 WL 1182419, at *8 (citations omitted). This opinion reaffirmed the City of Longmont rule that FERC would "measure the avoided cost of a full requirements customer as the avoided cost of the full requirements supplier since it is the supplier that avoids generation when the full requirements customer purchases from a QF." Carolina Power, 1989 WL 262068, at *6.

The Sweckers then commenced this action, seeking an order "enforcing the implementation of PURPA and FERC's PURPA regulations and declaring Midland's full avoided cost rate for purchasing surplus energy from plaintiffs and all other non-consenting Qualifying Facilities is the same rate which Midland pays CIPCO." The district court granted Defendants' motion to dismiss, concluding that Plaintiffs failed to state a claim upon which relief can be granted because, in light of FERC precedent and FERC's consideration of the Sweckers' claim in deciding not to act, the "Complaint contains no factual basis for a determination Plaintiffs have a plausible claim for a departure from the established definition of 'avoided cost rate.'" The court denied the Sweckers' motion for a new trial or, in the alternative, an altered or amended order, noting that it had considered and rejected the Sweckers' contention that Midland cannot pay the Sweckers at CIPCO's avoided cost rate because the Sweckers never consented to that rate, as 18 C.F.R. § 292.303(d) requires. Rather, the court determined, § 292.303(d) is inapplicable because "Plaintiffs sold energy directly to Midland -- not indirectly to CIPCO through Midland."

# III. Discussion

The Sweckers purport to raise three distinct issues on appeal, but their entire argument can be succinctly stated and analyzed: they contend that the plain language of 18 C.F.R. § 292.303(d) required Midland to obtain the Sweckers' consent as QF before CIPCO's avoided cost rate could apply to Midland's purchases, the district court erred in deferring to FERC's longstanding contrary interpretation of this regulation, and therefore their complaint stated a claim on which declaratory and injunctive relief from use of an unlawful avoided cost rate can be granted.

As we have explained, FERC adopted § 292.303(d) to provide an alternate means by which an all-requirements electric utility can meet its PURPA purchase obligations by "transmit[ting] the [QF's] energy or capacity to its supplying utility," in which case "the supplying utility is deemed to have made the purchase and, as a result the all-requirements obligation is not affected." Order No. 69, 45 Fed. Reg. at 12,219. The regulation provides:

> (d) *Transmission to other electric utilities.* If a qualifying facility agrees, an electric utility which would otherwise be obligated to purchase energy or capacity from such qualifying facility may transmit the energy or capacity to any other electric utility. Any electric utility to which such energy or capacity is transmitted shall purchase such energy or capacity under this subpart as if the qualifying facility were supplying energy or capacity directly to such electric utility. The rate for purchase by the electric utility to which such energy is transmitted shall be adjusted up or down to reflect line losses pursuant to § 292.304(e)(3) and shall not include any charges for transmission.

The language describing a utility "which would *otherwise* be obligated to purchase energy" (emphasis added) plainly states that § 292.303(d) only enables an electric utility such as Midland to shed its purchase obligation with a QF's consent, in which case the all-requirements supplier (here, CIPCO) purchases the QF's energy

or capacity as if it was directly supplied.[5]  However, that transfer of the purchase obligation never occurred in this case.  The Sweckers never consented to supply CIPCO, directly or indirectly, and they alleged in their complaint and conceded on appeal that "Midland purchases surplus demand and energy from plaintiff."  Thus, it is undisputed that Midland has upheld its PURPA obligation to purchase surplus energy the Sweckers made available.  See 18 C.F.R. § 292.303(a); Order No. 69, 45 Fed. Reg. at 12,220 ("[i]f the qualifying facility does not consent to transmission to another utility, the first utility retains the purchase obligation").

The Sweckers argue that Order No. 69 prohibits using the supplying utility's avoided cost rate when the all-requirements customer purchases from the QF absent the QF's consent.  FERC has consistently rejected this interpretation of § 292.303(d).  Rather, in City of Longmont and Carolina Power, without reference to § 292.303(d), FERC adopted the rule that CIPCO's avoided costs are the maximum rate that may apply to Midland's mandatory purchases from the Sweckers to discourage QFs from withholding consent for direct energy transfers to all-requirements suppliers.  This better serves the statutory purposes of "increased conservation of electric energy, increased efficiency in the use of facilities and resources by electric utilities, and equitable retail rates for electric consumers."  16 U.S.C. § 2601(1).  The Sweckers' pleadings put this situation squarely within the paradigm described in Carolina Power -- the Sweckers are "attempt[ing] to sell to the full requirements customer [Midland] instead of the full requirements supplier [CIPCO], claiming the supplier's full requirements rate as the avoided cost."  Carolina Power, 1989 WL 262068, at *5.

An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation."  Auer v. Robbins, 519 U.S. 452, 461

_____

[5]The procedural struggles between these parties illustrate why FERC chose to specify that the all-requirements customer retains the purchase obligation and may transfer the obligation only with the consent of the QF.  See Central Iowa Power Coop., 105 FERC ¶ 61,239, 2003 WL 22725391, at *4 (Nov. 19, 2003).

(1997) (quotation omitted). <u>Auer</u> deference is particularly appropriate when "there is no indication that [the agency's] current view is a change from prior practice." <u>Decker v. Nw. Envtl. Def. Ctr.</u>, 133 S. Ct. 1326, 1337 (2013). Here, FERC's interpretation of "avoided costs" when an all-requirements utility is required to purchase from a QF is not plainly erroneous; is consistent with the provisions of 18 C.F.R. §§ 292.101(b)(6), .303, and .304, read as a whole and in context; reasonably serves diverse statutory purposes when applying PURPA to a complex situation; and has been the agency's consistent practice since <u>City of Longmont</u>. FERC's interpretation is therefore controlling and forecloses the contrary interpretation of § 292.303(d) urged by the Sweckers on appeal. Applying this longstanding interpretation, the district court correctly concluded that the Sweckers' lack of consent to Midland transferring energy to CIPCO was "irrelevant since Plaintiffs never allege that Midland actually transferred Plaintiffs' energy to CIPCO."

## IV. Conclusion

For the foregoing reasons, we agree with the district court that the Sweckers' complaint failed to state a claim for relief; we therefore affirm the Rule 12(b)(6) dismissal. As there were no errors of law in need of correction, the district court did not abuse its discretion in denying the Sweckers' Rule 59(e) motion. <u>See</u> <u>Ellis v. City of Minneapolis</u>, 518 F. App'x 502, 505 (8th Cir. 2013) (standard of review). Accordingly, the judgment of the district court is affirmed.

BYE, Circuit Judge, dissenting.

As the Court notes, an agency's interpretation of its own regulation is not controlling when it is "plainly erroneous or inconsistent with the regulation." <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997) (quotation omitted). In this case, the Federal

Energy Regulatory Commission (FERC) adopted a rule in <u>City of Longmont</u>[6] and <u>Carolina Power</u>[7] without considering the consent provisions in the relevant regulation, 18 C.F.R. § 292.303(d), and without addressing the relevant and controlling provisions set forth in Order No. 69.[8] Because the rule adopted by FERC is inconsistent with both the controlling order and the controlling regulation, neither the district court nor our Court should defer to it. I therefore respectfully dissent from the decision to affirm the district court's dismissal of the Sweckers' complaint.

I

The Sweckers contend, and I agree, that § 292.303(d) gives a qualifying facility (QF) the discretion to choose whether to accept the avoided cost rate of a non-generating utility (Midland), or to bypass the non-generating utility and accept the avoided cost rate of the non-generating utility's supplier (CIPCO). I believe this is the only reasonable interpretation of the regulation when read in conjunction with Order No. 69.

In Order No. 69, FERC specifically addressed the situation where the utility obligated to purchase excess energy from a QF was not only a non-generating utility, but was also an all-requirements utility bound by contract to purchase all of its energy from the same supplying utility. In such a situation, there is necessarily tension between the utility's contractual obligations to its supplier, and the obligations imposed by federal law. This is exactly Midland's situation. Midland is both a non-generating utility and an all-requirements utility bound by contract to purchase all of

---

[6]39 FERC ¶ 61,301, 1987 WL 117113 (June 16, 1987).

[7]48 FERC ¶ 61,101, 1989 WL 262068 (July 25, 1989).

[8]Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, Order No. 69, 45 Fed. Reg. 12,214 (Feb. 25, 1980).

its energy from CIPCO. But the Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95-617, 92 Stat. 3117 (PURPA), obligates Midland to purchase the excess energy generated by any QF in its coverage area, such as the Sweckers' windmill. Midland therefore cannot comply with both federal law and its contract. If it purchases all of its energy from CIPCO and refuses to purchase energy from QFs, it is violating federal law. On the other hand, if Midland complies with federal law by purchasing excess energy from a QF in its coverage area, it is violating its contract with CIPCO.

In Order No. 69, FERC adopted the consent requirement set forth in § 292.303(d) to address this issue. First, FERC indicated the obligations imposed by PURPA must take precedence over the contractual obligations the non-generating utility may have to its supplier. See 45 Fed. Reg. 12,214 at 12,219 (explaining that if the contractual obligations of an "all-requirements rural electric cooperative[]" were permitted "to override the obligation to purchase from qualifying facilities, these contractual devices might be used to hinder the development of cogeneration and small power production"). As a consequence, the Commission stated the "mandate of PURPA to encourage cogeneration and small power production requires that obligations to purchase under this provision supersede contractual restrictions on a utility's ability to obtain energy or capacity from a qualifying facility." Id.

FERC next noted that a non-generating utility always has the option of seeking a waiver "if compliance with the purchase obligation would impose a special hardship on an all-requirements customer." Id. Midland sought a waiver in this case, which if granted would have required CIPCO to purchase the excess energy generated by QFs in Midland's area. FERC, however, denied Midland's request for a waiver, and therefore Midland remains obligated to purchase energy from the Sweckers' windmill.

In the absence of a waiver, FERC offered another "out" to a non-generating all-requirements utility caught in this Catch 22 between its contractual obligations to its

supplier and its federal obligation to a QF under PURPA. That is where § 292.303(d) comes into play. As explained by FERC in Order No. 69, § 292.303(d) creates a situation where a QF can essentially bypass a non-generating utility middleman (such as Midland), and transmit its energy straight through to the supplying utility (such as CIPCO). This "out" permits the non-generating utility caught in the middle to satisfy its contractual obligations to its supplier, but also satisfies the requirements of PURPA by giving a QF an alternative purchaser of its excess energy.

The key, however, is that § 292.303(d) expressly requires the QF to consent to this alternative arrangement that relieves the non-generating utility from its federally-imposed purchase obligations. The regulation specifically states "[i]f a qualifying facility *agrees*, an electric utility which would otherwise be obligated to purchase energy or capacity from such qualifying facility [i.e., Midland] may transmit the energy or capacity to any other electric utility [i.e., Midland's supplier, CIPCO]." 18 C.F.R. § 292.303(d) (emphasis added). If such a transfer takes place, the regulation goes on to state that the "electric utility to which such energy or capacity is transmitted [i.e., CIPCO] shall purchase such energy or capacity under this subpart as if the qualifying facility were supplying energy or capacity directly to such electric utility." Id.

There is no dispute that the Sweckers never consented to CIPCO purchasing their windmill's excess energy, and thus Midland still retains the obligation to purchase the Sweckers' excess energy pursuant to PURPA. Midland contends however, that irrespective of whether it retains the purchase obligation, or the purchase obligation has transferred to CIPCO, the avoided cost rate to use when paying the Sweckers is always CIPCO's avoided cost rate. In other words, the Sweckers must accept CIPCO's avoided cost rate if CIPCO becomes the purchaser, but the Sweckers must also accept CIPCO's avoided cost rate if Midland remains the purchaser.

-13-

Midland's position is inconsistent with Order No. 69 and § 292.303(d), and thus so is the Court's decision which adopts Midland's position. In Order No. 69, when explaining that the purchase obligation remains with the non-generating utility if a QF does not consent to the pass-through transmission to the supplying utility, FERC expressly gives examples where the QF may choose between the supplier's (i.e., CIPCO's) avoided cost rate or the non-generating utility's (i.e., Midland's) avoided cost rate. If, as Midland contends, the supplier's avoided cost rate is *always* applicable, there would have been no need for FERC to discuss situations where a QF might choose one over the other.

Order No. 69 expressly states: "There are several circumstances in which a qualifying facility might desire that the electric utility with which it is interconnected [i.e., Midland] not be the purchaser of the qualifying facility's energy and capacity, but would prefer instead that an electric utility with which the purchasing utility is interconnected [i.e., CIPCO] make such a purchase." 45 Fed Reg. 12,214 at 12,219. The Commission then sets forth an example where a non-generating utility's (Midland's) avoided cost rate may actually be *lower* than the supplying utility's (CIPCO's) avoided cost rate, such that it would be beneficial to the QF to consent to transmission directly to the supplier:

> If, for example, the purchasing utility is a non-generating utility, its avoided costs will be the price of bulk purchased power ordinarily based on the average embedded cost of capacity and average energy cost on its supplying utility's system.[9] As a result, the rate to the qualifying facility would be based on those average costs. If, however, the qualifying facility's output were purchased by the supplying utility, its output ordinarily will replace the highest cost energy on the supplying utility's system at that time, and its capacity might enable the supplying utility to avoid the addition of new capacity. Thus, *the avoided costs of the*

---

[9]The amount of this cost (Midland's "price of bulked purchased power") is not clear in this record, but appears to be the correct amount to pay the Sweckers.

*supplying utility may be higher than the avoided cost of the non-generating utility.*

Id. (emphasis added).

The necessary and unavoidable implication of FERC's comparison between the supplying utility's avoided cost rate (CIPCO's), and the non-generating utility's avoided cost rate (Midland's), is that **both** avoided cost rates can apply. And it is equally clear from the detailed discussion set forth in Order No. 69 that the issue of which utilities' avoided cost rate applies is determined solely by the QF's consent. If Midland's position is correct, and an all-requirements non-generating utility was **always** entitled to use the supplying facility's avoided cost rate, there would have been no reason for FERC to have compared the two utilities' avoided cost rates in Order No. 69.

FERC goes on to state in Order No. 69 that "if the qualifying facility does not consent to transmission to another utility [CIPCO], the first utility [Midland] retains the purchase obligation." Id. at 12,220. When read in conjunction with the earlier comparison of the avoided costs rates of the non-generating utility and the supplying utility, the unavoidable conclusion is that the non-generating utility's (Midland's) avoided cost rate applies when the QF does not consent to the pass-through transmission to the supplier.

That is precisely the situation involved here. The Sweckers never consented to the transmission of their windmill's excess energy directly to CIPCO. As a consequence, Midland retains the purchase obligation. Therefore, it is Midland's avoided cost rate, not CIPCO's, which should be used when determining the amount to pay the Sweckers. The district court thus erred in dismissing the Sweckers' complaint.

-15-

As the Court itself notes, the rule FERC adopted in <u>City of Longmont</u> and <u>Carolina Power</u> was without reference to the consent provisions of § 292.303(d), or without addressing the relevant provisions set forth in Order No. 69 discussed herein. Thus, to the extent FERC has created a contrary rule whereby the supplying utility's avoided cost rate is always used when a non-generating utility has the initial purchase obligation, irrespective of whether or not a QF has consented to a pass-through transmission to a supplying utility, such a rule is not entitled to deference because it is plainly inconsistent with the controlling order and regulation.

II

I respectfully dissent.

_____